556 So.2d 983 (1990)
Houston TURNER, et ux., Plaintiffs-Appellees,
v.
Dr. C.H. SMITH, et al., Defendants-Appellants,
The Louisiana Patient's Compensation Fund, Intervenor-Appellant.
No. 88-1038.
Court of Appeals of Louisiana, Third Circuit.
February 7, 1990.
*984 Sera Russell III, Lafayette, for plaintiffs-appellees.
Mathews, Atkinson, Guglielmo, Marks & Day, Herbert Mang, Jr., Glen S. Love, Baton Rouge, for defendants-appellants.
Carruth, Cooper & Adams (Wm. R. Carruth, Jr., S. Alfred Adams, Baton Rouge, for intervenor-appellant.
Before DOUCET, YELVERTON and KING, JJ.
KING, Judge.
The issues presented by this appeal are whether the trial court erred in finding that plaintiff proved the negligence of the doctor in his medical malpractice claim and whether the trial court erred in the quantum of general and special damages awarded to plaintiff.
Houston Turner (hereinafter plaintiff) filed a medical malpractice claim against Dr. Curt H. Smith (hereinafter defendant), a qualified health care provider under the provisions of La.R.S. 40:1299.42, and his professional liability insurer, Louisiana Medical Mutual Insurance Company. Plaintiff alleged that defendant was negligent when he tied a suture around plaintiff's sural nerve in his left leg during varicose vein surgery. Plaintiff's wife, Ruth Turner, asserted a claim for loss of consortium as a result of the injury to her husband. The case was tried before the bench on March 15, 1988. After completion of the evidence, the trial judge took the matter under advisement. On May 11, 1988, the trial judge assigned written reasons, rendered judgment in favor of plaintiff and against defendant for damages in the amount of $214,648.19, and rejected the claim of plaintiff's wife for loss of consortium. A formal written judgment was signed in favor of plaintiff and against defendant and his professional liability insurer, Louisiana Medical Mutual Insurance Company, in solido, for damages in the amount of $100,000.00, the limit of their policy and the defendant's legal obligation, and against the Louisiana Patient's Compensation Fund (hereinafter the Fund) for $114,648.19, the amount of the judgment over $100,000.00, because defendant was a qualified health care provider within the meaning of La.R.S. 40:1299.42. The claim of plaintiff's wife for loss of consortium was dismissed. Defendant and his insurer timely filed A Motion For A Suspensive Appeal. The Fund also timely filed a Motion To Intervene in the suit and a Motion For A Suspensive Appeal. Plaintiff answered the appeals seeking an award for loss of consortium suffered by his wife. We affirm.

*985 FACTS
Plaintiff was 66 years old at the time of trial and had retired from the Central Louisiana Electric Company (CLECO) after working there for over forty years. Plaintiff started work at CLECO as a utility linesman and eventually worked his way up to local customer service manager. His job required that he drive, climb poles, walk the lines, and essentially anything else that needed to be done to service the customers in his area. Plaintiff had been experiencing pain in his lower legs for a period of four to five years prior to the surgery; however, this pain did not interfere with plaintiff's job to a point where he would lose time from work.
Plaintiff was initially treated conservatively for his pain by his family physician, Dr. F.P. Bordelon, who recommended that he wear elastic support hose. When Dr. Bordelon realized that the hose were not working, he referred plaintiff to defendant, a cardiovascular surgeon.
Defendant admitted plaintiff to St. Francis Cabrini Hospital on August 23, 1983 and had a venogram performed which revealed varicosity in both legs. On August 25, 1983, defendant performed surgery on plaintiff's left leg, which was his worst side. There were two parts to the surgery. First, the varicose veins of the greater saphenous system were stripped. An incision was made in the groin area and near the ankle, and a stripping device was inserted in the leg which removed the entire vein from the ankle to the groin. This procedure does not require placement of any sutures in the vicinity of the sural nerve. Consequently, it can be assumed that plaintiff's sural nerve was not injured during this part of the surgery. The second part of the surgery involved the stripping of superficial veins in the left posterior mid-calf area. A sharp dissection was made down to the fascia (the sheath or tissue that surrounds the muscle) in order to remove these superficial veins. Defendant stated that, when twisting or pulling these veins out, they may break off below the fascia layer and often it is necessary to open the fascia in order to tie off or suture a bleeding vein. This was what was done during plaintiff's surgery. Defendant opened the fascia to tie off a bleeding vein and, when he closed the fascia, he inadvertently looped a suture around the sural nerve in plaintiff's left leg which, in effect, amputated plaintiff's sural nerve.
Defendant testified that, at the time of surgery, he never saw plaintiff's sural nerve and never realized he had tied a suture around it. Defendant further stated that the only way to avoid injuring the nerve is to know the area where the nerve is supposed to run and avoid sutures in that area. The sural nerve is about 2 millimeters in diameter, about the size of pencil lead, and runs down the back of the lower leg. It runs just under the fascia and at some point becomes superficial to the fascia and continues running down the leg. The sural nerve is a sensory nerve which supplies feeling or sensation to the lower third portion of the back of the calf, to the outside of the foot, and to the fifth toe. An injury to a sensory nerve does not cause loss of motor functions or movement of the limb; however, when an injury to the nerve produces a neuroma, it can be very painful and can seriously interfere with the normal use of the leg.
Defendant stated he did not intentionally tie a suture around the nerve and that there was no medical reason to do so. Defendant did not advise plaintiff before surgery that accidentally tying a suture around the nerve, which could result in a loss of feeling in the leg, was a known risk of the surgery because, in his experience, that particular problem was very rare. In fact, in over a hundred varicose vein surgeries that defendant has performed, this type of injury has never occurred to any of his patients.
The first thing plaintiff remembered when he woke up after surgery was hurting in his left leg. He had pain on the left side of his leg, in the back of his leg, and down to his little toe. He was given pain medications and advised to try and walk on the leg, but plaintiff could not move his left foot at all. He stated that "it felt like my ankle was broken or badly sprained."
*986 Defendant believed that plaintiff's pain was unusually severe and not ordinary post-operative pain and suggested that an orthopedist examine plaintiff.
Dr. Paul Davis, Jr., an orthopedic surgeon who had treated plaintiff's family in the past, examined plaintiff on September 6, 1983. After his examination, he concluded that there was some irritation to the sural nerve and injected it with a local anesthetic and steroid. When plaintiff continued to complain of pain, Dr. Davis decided that the area should be explored to see what was wrong. Plaintiff was admitted to the hospital on September 18, 1983 and exploratory surgery was performed by Dr. Davis on September 19, 1983.
Dr. Davis made an incision through the skin near the old healed incision. He cut down to the fascia and found a suture going through the fascia and tied outside of the fascia. When he took the suture out and opened up the fascia, he discovered that the sural nerve had been enclosed in that suture. Dr. Davis examined the nerve and on the part of the nerve that was still alive, found a neuroma (a tumor arising from nerve tissue). Dr. Davis cut out the neuroma and buried the end of the nerve into the muscle. He stated that he "knew it would form another neuroma, which is normal. That's the way it works. But if we'd get it up there and in the muscle, maybe it wouldn't hurt as much and wouldn't bother the patient." Dr. Davis stated that any time you cut a nerve off, it forms a neuroma which, in most cases, is very painful.
After this operation, plaintiff was relieved of some pain. He was finally able to get out of a wheelchair and walk, although he continued to experience pain when he walked. Plaintiff went back to work part time but had to quit work when the pain in his leg worsened.
Plaintiff saw doctors in Houston, Texas, who referred him to Dr. David Kline, a neurosurgeon in New Orleans, Louisiana. Dr. Kline's initial examination of plaintiff was on August 6, 1984, at which time Dr. Kline stated that he felt plaintiff's pain was due to the reformation of a neuroma. The only recommendation Dr. Kline had was to do another surgery and remove a longer length of the nerve, treat the upper end where the nerve was cut and bury it deep into the muscle. This surgery was performed on August 29, 1984. Following this surgery, plaintiff stated that his leg was much better and that most of the severe pain was gone. However, plaintiff returned to Dr. Kline on July 1, 1985 complaining of discomfort. Dr. Kline told plaintiff that he should expect to have some continuing pain and discomfort and that he should only return if his pain got much worse. Additionally, Dr. Kline stated that a neuroma will always form when a nerve is cut and that he was sure some degree of neuroma had again formed in plaintiff's leg. The only cure for plaintiff, according to Dr. Kline, would be "another surgery which would end up with another neuroma, which would perhaps end up with the same result in the future...."
After a trial on the merits, the trial judge ruled in favor of plaintiff and awarded $214,648.19 in damages, consisting of $117,060.98 for loss of economic benefits, $7,839.99 for past medical expenses, $14,747.22 for loss of sick leave benefits, and $75,000.00 for past and future pain and suffering. From this judgment, defendant and his insurer appeal alleging that the trial judge erred in finding that plaintiff proved the negligence of defendant by a preponderance of the evidence. The Fund also appeals this judgment alleging that the trial court erred in the amount of general and special damages awarded. Plaintiff has answered the appeal seeking an award for Ruth Turner's loss of consortium.

THE NEGLIGENCE OF DEFENDANT
Defendant contends that the trial judge applied an improper burden of proof in determining his negligence, and singles out two phrases in the trial judge's written reasons for judgment to support his contention. First, defendant argues that the trial judge held defendant to a higher standard of care than is required by statute and the jurisprudence. Defendant claims this *987 is shown by the following language from the trial judge's reasons for judgment:
"Testimony on behalf of Dr. Smith revealed that it was common knowledge that the sural nerve did not always follow the same path and it was not negligent [sic] for the nerve to be amputated. These two premises are a contraction of terms. Because the sural nerve does not follow the same path in every patient the operating doctor should use more than reasonable care and skill in avoiding the nerve." (Emphasis added.)
La.R.S. 9:2794(A)(2) provides that a plaintiff in a medical malpractice action has the burden of proving:
"[t]hat the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill ..." (Emphasis added.)
Because the statute only requires "reasonable care," defendant claims that the trial judge, when he used the "more than reasonable care and skill" test to determine defendant's negligence, erred by holding defendant to a higher and erroneous standard of care.
Additionally, defendant asserts that the trial judge misstated the legal standard applicable in a medical malpractice action when, in his reasons for judgment, he stated the following:
"After examining all of the evidence presented, the Court finds that the plaintiff has proven the negligence of Dr. Smith by a preponderance of the evidence. But for Dr. Smith amputating the sural nerve the plaintiff would not have suffered the injury. Dr. Smith did not use reasonable care and skill, he operated in a bloody field, and failed to avoid the sural nerve. Also, the testimony of Dr. Smith and his experts failed to rebut the inference of negligence. The expert testimony also revealed that the injury which Mr. Turner received was not an ordinary risk of varicose vein surgery." (Emphasis added.)
Defendant argues that an injury alone does not infer negligence. La.R.S. 9:2794(C) provides in part that in a medical malpractice action "... injury alone does not raise a presumption of the physician's ... negligence...."
Therefore, defendant claims that the trial judge was wrong when he inferred negligence from the injury and then found defendant negligent for failing to rebut an "inference of negligence." Defendant argues that since an inference of negligence could be created by application of the doctrine of res ipsa loquitur, that perhaps the trial judge applied this inappropriate legal doctrine in this case.
After carefully reviewing the entirety of the trial judge's reasons for judgment, it is clear that he applied the appropriate burden of proof for a medical malpractice claim. Before discussing defendant's liability, the trial judge, in his written reasons for judgment set forth the burden of proof he placed on plaintiff as:
"The burden was placed on a plaintiff in a medical malpractice suit was set forth in Frasier v. Department of Health and Human Resources, 500 So.2d 858 (1986)
`In a medical malpractice suit based on the negligence of a physician, the plaintiff must meet the burden of proof defined by LSA-R.S. 9:2794 as succinctly set forth in White v. McCool, 395 So.2d 744 [774], 776 (La. 1981), as follows:
... `that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care plaintiff suffered injuries that would not otherwise have been incurred.'"
While the trial judge in his reasons for judgment may not have used the precise language he quoted, it is clear that he nevertheless applied and held plaintiff to the correct burden of proof. Defendant has simply taken out of context two phrases of the three page well written reasons for judgment in an effort to establish some error. We find that the trial judge applied the proper burden of proof in this case.
Next, defendant argues that, assuming the trial court did apply the correct burden of proof, the plaintiff failed to meet his burden by a preponderance of the evidence. *988 The plaintiff's burden of proof in a malpractice action, as set forth in La.R.S. 9:2794, is as follows:
"(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred."
The first part of the burden, the degree of knowledge or care ordinarily exercised by physicians within the medical specialty, has unquestionably been established because defendant himself admits that he unintentionally sutured the sural nerve and that there was no medical or therapeutic reason to do so. The degree of care ordinarily exercised is the degree of care defendant gave his other patients when he performed this operation over one hundred times without injuring the sural nerve.
The third part of the burden has also unquestionably been established, that is, as a result of a failure to exercise this degree of care, plaintiff suffered injuries that would not otherwise have been incurred. Plaintiff complained of pain in his left leg prior to the varicose vein surgery, but there is no question that it was the surgery and the severing of his sural nerve which caused the painful neuroma to form and thus caused the loss of feeling in his leg and foot.
It is the second part of the burden, which states that defendant failed to use reasonable care and diligence in the application of his skill, that defendant argues plaintiff did not prove.
Five doctors testified in this case: two doctors on defendant's behalf; Dr. James David and Dr. Philip Lindsay, a doctor on plaintiff's behalf, Dr. Richard Williams, and the two doctors that performed corrective surgery on plaintiff; Dr. Paul Davis, Jr. and Dr. David Kline.
Drs. Davis, Lindsay and David, all vascular surgeons, testified that in their opinion, defendant was not negligent in suturing plaintiff's sural nerve. All three doctors stated that the nerve has a variable course and that it is not always possible to predict exactly where it is. The best way to avoid the nerve during surgery is to know generally where it is and try to avoid that area. Dr. Lindsay testified that "... you know there are numerous sensory nerves there and you generally will avoid them by knowing they're in the general area. You do not know specifically because anatomy varies but you know generally where they are and you observe for them ... try to stay away from them." Testimony also revealed that the nerve was rather small (2 millimeters in diameter) and that it is the same color as the surrounding tissues. The operating surgeon is not able to see the nerve when it runs underneath the fascia because the fascia is not transparent. Additionally, when a surgeon performs varicose vein surgery, his operative field is bloody, which further obscures his vision.
While these doctors believe that defendant's conduct did not fall below the standard of care expected of vascular surgeons, in all the varicose vein surgeries that they have performed (collectively over 300) none of these doctors ever tied a suture around a sural nerve on any occasion. Moreover, other than the defendant, no doctor has ever heard of any other surgeon who has tied off the sural nerve during varicose vein surgery. Dr. David testified that tying off the sural nerve was not common and that he does not speak with or warn *989 his patients before surgery about this complication.
Dr. Williams, the general surgeon who testified on behalf of plaintiff, stated that he had performed hundreds of varicose vein operations and had never encountered a problem with a suture placed around the sural nerve. He further stated that tying off the sural nerve during varicose vein surgery violated the standard of care for surgeons doing varicose vein surgery. When asked to explain why he thought it violated the standard of care, Dr. Williams explained:
"Well, a surgeon is called upon to have an accurate knowledge of anatomy. Surgeons do enter people's bodies and they cut and they sew and it's encumbent upon them to not cut and to not sew things that don't need cutting and sewing in such a manner as to cause injury to the person. The location of the sural nerve is reasonably well known. There is no justification for tying it, cutting it or sewing it in the performance, in my opinion, of varicose vein surgery."
The trial judge, after considering all the evidence presented, found that the preponderance of the evidence proved that defendant was negligent. The trial court noted that "... no written medical literature was introduced to show that this type of accident was common, something to be guarded against, or an ordinary risk in varicose vein surgery." Additionally, the court stated that testimony revealed that defendant could have, but did not, apply pressure to the arteries in the leg or raise the leg in order to lessen the flow of blood and make the operative field less bloody. The trial court also recognized that, although the doctors that testified in defendant's behalf opined that he was not negligent, "no doctor testified that the accident was unavoidable."
This court, after carefully reviewing the record and evidence before us, cannot say that the trial court was manifestly wrong or clearly erroneous in its findings of fact or its decision. A surgeon is called upon to have a knowledge of anatomy and to respect the presence or possible presence of structures in the area in which he is working. The trial court was not wrong when it found that plaintiff proved by a preponderance of the evidence that defendant "did not use reasonable care and skill, he operated in a bloody field and failed to avoid the sural nerve."

DAMAGES
The Fund argues on appeal that the general damages awarded by the trial court were excessive. The trial court awarded plaintiff $75,000.00 for past and future pain and suffering.
In Thomas v. West Calcasieu-Cameron Hosp., 497 So.2d 375 (La.App. 3 Cir.1986), we summarized the appellate court's authority to review a trial court's damage award by stating that:
"Before a trial court's award in general damages may be viewed as excessive or inadequate, this Court must look first, not to prior awards, but to the individual circumstances peculiar to the case. Only after an analysis of the facts of a particular case and an analysis of the particular injuries to the party may this Court determine the excessiveness or inadequacy of the award. Reck v. Stevens, 373 So.2d 498 (La.1979); Darbonne v. Safeco Ins. Co. of America, 452 So.2d 801 (La. App. 3 Cir.1984). After an examination of the particular facts of a case, an appellate court must then determine whether the trier of fact clearly abused his much discretion in awarding damages. Former La.C.C. Art. 1934(3); Reck, supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Darbonne, supra.

An examination of prior awards, in the initial determination of excessiveness or insufficiency, serves a limited function-to serve as an aid in determining whether the award complained of is greatly disproportionate to past awards for `truly similar' injuries. Reck, supra, at page 501, citing Coco, supra. The mass of awards for truly similar injuries may therefore be used as an aid in determining a disproportion in the award complained of when viewed in light of the *990 facts of the case; however, an appellate court will only disturb the award of the trial judge upon an initial determination of an abuse of the great discretion afforded the trier of fact. La.C.C. Art. 2324.1; Williams v. State Farm Mut. Auto. Ins. Co., 349 So.2d 1275 (La.App. 1 Cir.1977), writ den., 351 So.2d 175 (La. 1977)." (Footnote omitted.) Thomas v. West Calcasieu-Cameron Hosp., 497 So.2d 375 at page 379 (La.App. 3 Cir. 1986).
With these principles in mind, we examine the individual circumstances peculiar to this case.
After plaintiff's first surgery to remove the varicose veins, he was in severe pain and could not move his left foot. Plaintiff tried to walk while he was recovering at the hospital, but he could not put his left foot down on the floor. Plaintiff could not walk and remained in a wheelchair for over three weeks until his second surgery by Dr. Davis. Following the second surgery, plaintiff stated that he "was able to walk but I mean I had a lot of pain, but it was not as bad as it was before. I did get, which was the first for the first time that I ever got at least two or three hours sleep."
Approximately four months later, plaintiff's pain worsened. He ultimately underwent a third surgery, performed by Dr. Kline. Plaintiff stated that this surgery made his leg "a lot better" although he was still experiencing some pain.
When plaintiff's sural nerve was unintentionally sutured, it caused a loss of feeling in plaintiff's left leg and foot and also caused a neuroma to form. Every doctor that testified stated that when a neuroma forms on a nerve ending, it can be very painful. Also, Dr. Kline testified that whenever a nerve is cut, a neuroma will form and the only remedy for that is more surgery. Dr. Kline also stated that plaintiff will continue to experience discomfort and pain in his left leg.
Plaintiff's left leg was not pain-free prior to the first surgery. He had experienced pain associated with varicose veins for four to five years prior to surgery. However, at the time of trial, plaintiff had gone through two corrective surgeries, had experienced substantial pain and suffering, had a permanent loss of feeling in his leg and foot, and will continue to experience pain associated with the neuroma in the future. As Dr. Kline stated, "there is no way known to us or mankind at this point in time to absolutely prevent a neuroma from forming."
Considering this evidence, we do not find that the trial judge abused his discretion in making an award of $75,000.00 for past and future pain and suffering and that such an award is not excessive.
The Fund also argues that the trial court erred in awarding special damages without proof of plaintiff's disability. The trial court awarded plaintiff $117,060.98 for lost economic benefits. It should be noted that a stipulation entered into between the parties before trial established that if connexity to the accident was proven, plaintiff would be entitled to recover that amount.
The Fund claims that the only testimony concerning plaintiff's disability came from plaintiff and his wife and that this evidence did not establish disability from employment. Absent proof of disability, the Fund argues, plaintiff cannot recover his economic losses.
Plaintiff testified at trial that he either "had to go on disability or retire, because I didn't feel that I could work anymore." In addition to plaintiff's subjective determination, Dr. Davis also opined that plaintiff was disabled. His testimony was as follows:
"Q. Dr. Davis, in April of 1984, did you conclude that Mr. Turner was disabled from his employment?
A. Yes, I did.
Q As I understand it at that time, you filed a report indicating that the length of that disability was undetermined.
A. Yes."
This testimony is uncontradicted. Absent any testimony to the contrary, the trial court was correct in concluding that plaintiff was disabled from employment *991 and awarding a judgment for lost economic benefits.
The Fund next contends that the trial court should not have awarded $14,747.22 to plaintiff as loss of sick leave benefits because it was plaintiff's employer's policy that accumulated sick leave and vacation had to be taken prior to retirement or forfeited. Since plaintiff had to use the sick leave and vacation or lose it, the Fund argues it should not constitute a portion of his damage claim.
From February 1, 1984 to July 31, 1984, plaintiff did not work, but he collected his salary by virtue of taking his accumulated sick leave and vacation time.
It is well established that sick leave and vacation time is subject to the collateral source rule. Hawthorne v. Southeastern Fidelity Ins. Co., 387 So.2d 26 (La.App. 3 Cir.1980). Plaintiff is clearly entitled to recover the lost wages attributable to such lost time even though he was compensated. It is irrelevant that sick leave and vacation time is forfeited at retirement if not used. See, Blanco v. Travelers Ins. Co., 350 So.2d 1252 (La.App. 4 Cir.1977). For these reasons, we find that the trial court was correct in awarding the damages for loss of sick leave benefits.

LOSS OF CONSORTIUM
Plaintiff filed an answer to the appeal seeking an award for loss of consortium suffered by Ruth Turner, his wife. The trial court did not include this as an element of damages in its award.
The only evidence found in the record concerning loss of consortium was Ruth Turner's testimony that plaintiff was ornery, aggravated, wouldn't laugh and couldn't make love because of pain. She also stated that she now has to cut the firewood for the house because plaintiff cannot do so.
In Vidrine v. Government Employees Ins. Co., 528 So.2d 765 (La.App. 3 Cir.1988), writ den., 532 So.2d 156 (La.1988), we stated:
"`The compensable elements of damage in a loss of consortium claim are loss of society, sex, and service and support. See LSA-C.C. 2315(B).... `Society' is broader than loss of sexual relations. It includes general love, companionship, and affection that the spouse loses as a result of the injury. `Support' is the lost family income that would go to support the uninjured spouse. `Service' is the uncompensated work around the house or educational help with the children which presumably will, as a result of the injury, have to be obtained from another source and at a price...." (Citations omitted.) Vidrine v. Government Employees Ins. Co., 528 So.2d 765, at pages 769-770 (La.App. 3 Cir.1988), writ den., 532 So.2d 156 (La.1988).
The testimony of Ruth Turner was vague and sketchy. There was no testimony that the marital relationship was adversely affected other than the claimed loss of sexual relations. Consequently, considering the broad discretion of the trial court, we cannot say that it was clearly wrong in denying plaintiff's wife's claim for loss of consortium and we will not award judgment for damages on appeal.
For the foregoing reasons, the judgment of the trial court is affirmed. All costs are taxed equally between defendants-appellants, Dr. C.H. Smith and Louisiana Medical Mutual Insurance Company, and intervenor-appellant, The Louisiana Patient's Compensation Fund.
AFFIRMED.