772 So.2d 897 (2000)
Nicole THIBODEAUX, et al.
v.
Irvin BERNARD, et al.
No. 00-72.
Court of Appeal of Louisiana, Third Circuit.
November 2, 2000.
*899 Barry J. Heinen, Lafayette, LA, Counsel for Plaintiffs-Appellants.
Thomas R. Hightower, Jr., Frances Gossen O'Neal, Lafayette, LA, Counsel for Defendants-Appellees.
(Court composed of Chief Judge NED E. DOUCET, ULYSSES GENE THIBODEAUX, SYLVIA R. COOKS, BILLIE COLOMBARO WOODARD and JOHN D. SAUNDERS, Judges).
COOKS, Judge.
Nicole Thibodeaux was involved in an automobile accident on September 1, 1994 in Lafayette, Louisiana. Nicole alleged she suffers, as a result of the accident, from myofascial pain syndrome principally located in the right shoulder area and severe depression.
Nicole filed suit against Irvin Bernard (the driver of the other car), his company (Bernard Office Supply), and their insurer (Shelter Mutual Insurance Company). Claims for loss of consortium were also filed on behalf of Nicole's husband, Steve and their two minor children. Prior to trial the parties stipulated Irvin Bernard was solely responsible for the accident. Irvin Bernard and Bernard Office Supply were eventually dismissed as parties. Shelter Insurance Company remained as the sole defendant.
The case was tried before a jury, which awarded the following sums to Nicole Thibodeaux:

Past Pain and Suffering $ 30,000.00
Future Pain and Suffering $ 40,000.00
Past Medical Expenses $ 50,932.00
Future Medical Expenses $ 7,600.00
Past Lost Wages $ 206.00
Future Lost Wages $ 12,582.00
Loss of Enjoyment of Life, Past and
 Future $ 35,000.00
 ____________
Total $176,320.00

The jury did not make any loss of consortium awards. Plaintiffs lodged this appeal, contending the jury erred in awarding inadequate (1) future general damages; (2) future medical expenses; (3) past lost wages; and (4) future lost wages. Plaintiffs also appeal the jury's failure to make an award for Steve Thibodeaux's loss of consortium.[1]

Plaintiff's Medical History
On August 9, 1994 Nicole Thibodeaux was examined by Dr. Chris Hayes, her employer at the time. She complained of right ear pain, nervousness, headaches and informed Dr. Hayes she was having marital problems. Nicole also told the doctor she "cries all the time and can't sleep." Dr. Hayes believed she was suffering from depression and possible right temporomandibular joint (TMJ) pain. She prescribed Elavil for Nicole's depression.
Nicole again sought medical care from Dr. Hayes on September 2, 1994, informing the doctor she had been in an automobile accident the previous day. Nicole complained of neck pain radiating in both shoulders and burning pain in the left trapezius. Dr. Hayes felt she had a combination strain of the left trapezius and cervical muscles. She prescribed pain medication. On September 6, 1994, Nicole called Dr. Hayes complaining of "severe frontal headaches." Dr. Hayes restarted her on Elavil, which along with helping depression, works to prevent muscle tension headaches. Dr. Hayes saw her again on September 23, 1994 and noted she was exhibiting muscle spasms in the right and left trapezius, muscular headaches and was having crying spells. On October 5, 1994, *900 Nicole called and informed Dr. Hayes she could not report to work because of a severe headache. That day Dr. Hayes had a CT scan performed which results were normal. On Nicole's October 14, 1994 visit, Dr. Hayes noted her headaches were "better and fewer" and she was "depressed but better." This was Nicole's last visit with Dr. Hayes.[2] Dr. Hayes testified she felt Nicole's depression following the accident was a continuation of the depression she first complained of on August 9, 1994. However, Dr. Hayes felt Nicole's physical problems were caused by the accident.
Nicole did not undergo any further medical treatment until she saw Dr. Robert Franklin on March 27, 1995, and complained of neck and upper back pain with associated headaches. Dr. Franklin found no spasms or trigger points on his examination. In response to Nicole's complaints, he ordered a MRI, a CT scan and two EMG's, which results were all normal. Dr. Franklin diagnosed Nicole as suffering from myofascial pain syndrome affecting the trapezius, which more than likely caused her headaches. He referred her to a physical therapist. Dr. Franklin saw her again on May 9, 1995 and noted "a trigger point" in the right trapezius. Dr. Franklin felt she was progressing when he saw her on July 17, 1995, but she had not reached maximum medical improvement. He referred her to Dr. Robert Morrow for an orthopaedic opinion.
Dr. Morrow agreed with Dr. Franklin's diagnosis of myofascial pain syndrome. Dr. Morrow was concerned about the continuing headaches and recommended Nicole see Dr. Steven Snatic, a neurologist, for an evaluation.
Dr. Snatic first examined Nicole on October 4, 1995, and treated her "on and off" for the next three and one half years. During his initial examination, he found Nicole was tender in the right trapezius. Dr. Snatic tried numerous treatments to ease Nicole's discomfort, including wearing a shoulder support, injecting the right trapezius area and performing nerve blocks. The treatments initially were successful, but Nicole's pain always returned over time. On October 2, 1996, another MRI was performed, which results again were normal. Dr. Snatic referred Nicole to Dr. Julius Weisberg, a neurosurgeon, for another evaluation.
Dr. Weisberg, in conjunction with Dr. Charles Aprill (a radiologist), concluded she suffered from a joint problem. When injections to the joint area were only temporarily successful, Dr. Weisberg recommended a cervical median branch neurotomy to denerve the area around the joint to relieve the pain. The surgery was only partially successful and the pain returned. At that point, Dr. Weisberg returned Nicole to Dr. Snatic's care and recommended she undergo therapy to the trigger point in the right trapezius area.
Dr. Snatic referred Nicole to Dr. Wayne Lindemann for the recommended therapy which included two more nerve blocks. She also received trigger point therapy for a seven month period beginning in April, 1998. Nicole's shoulder pain continued, but her headache problems improved. According to Dr. Snatic, Nicole became more depressed over time and he performed a pain profile to determine if she needed psychiatric care. The profile indicators were positive, prompting Dr. Snatic to refer Nicole to Dr. James Blackburn, a psychiatrist.
Dr. Blackburn began seeing Nicole in October, 1998 continuing through the trial. He felt she suffered from myofascial pain syndrome. He placed her on anti-depressant medication. Dr. Blackburn recommended Nicole see Dr. Morrow one more time to insure there was nothing surgically available to relieve her condition. Dr. Blackburn testified Nicole's depression is directly related to her chronic pain, and if *901 the pain were eliminated so would the depression. At the time of trial, Dr. Blackburn felt she had improved, but her depression still required treatment.
On January 21, 1999, Dr. Randall Lea, an orthopedist, performed an independent medical examination of Nicole. While he found she has "some" medical problems with accompanying discomfort, Dr. Lea did not believe she has a major cervical problem. He also found Nicole engaged in symptom magnification, although he did not believe it was intentional. He felt Nicole was very capable of gainful employment, particularly of a sedentary nature; and he did not believe her condition will worsen. He assigned her a permanent impairment rating of five percent with some lifting restrictions.
At the request of defendants, Nicole was evaluated by Dr. Jimmy Cole, a clinical psychologist. Dr. Cole performed a Minnesota Multi Phasic Personality Inventory (MMPI). The purpose of this test was to determine the extent of any psychological issues Nicole was confronting. According to Dr. Cole, the MMPI revealed Nicole had significant psychological overlay and a somatoform disorder. Dr. Cole stated a somatoform disorder is a preoccupation with physical complaints for which there is no objective basis.

ANALYSIS

1. Future General Damages.
Nicole argues the jury abused its discretion in awarding her insufficient future general damages. The jury awarded her $40,000 for future pain and suffering, and $35,000 for past and future loss of enjoyment of life. Nicole suggests only one half of the $35,000 award ($17,500) is for future loss of enjoyment of life, and the balance when added to the future pain and suffering award equals $57,500 for future general damages. She asks this court to raise the future general damage award to a minimum of $150,000.00.
Our supreme court in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), set out the rules for review of general damages awards as follows:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck [v. Stevens, 373 So.2d 498 (La.1979) ] to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Based upon the medical and lay testimony, there is little doubt that Nicole suffered injury to her shoulder and accompanying pain as a result of the accident. Dr. Lea, who performed the IME, testified she has a five percent impairment and assigned limitations on her activities. Nicole testified she continues to have pain in her shoulder, which is magnified by greater activity. She is still taking pain medication on a daily basis, and continues to battle her depression. She stated she would like to return to work, but does not know when she will be able to physically endure daily employment. She also testified her ability to perform her duties as a mother and a wife has been drastically impaired by her constant pain.
*902 However, defendants note after the accident, Nicole continued to work for Dr. Hayes for approximately three months. After her last visit with Dr. Hayes on October 14, 1994, Nicole did not seek any further medical attention until March 27, 1995. Nicole also ran a day care center at her house from November of 1995 until April of 1999, caring for up to six children at one time. Although Nicole testified she continues to experience significant pain, she cooks, picks up after her children, dresses them and drives them to school.
Defendants also note there is conflict in the medical testimony regarding the extent of Nicole's depression, if any; and what portion of the depression is attributable to the accident at issue. Dr. Hayes testified she felt Nicole's depression following the accident was a continuation of the depression she first complained of and was diagnosed on August 9, 1994. Dr. Blackburn testified he felt Nicole's depression was related to her pain, and if the pain went away so would the depression.
Given the great discretion accorded a jury's decision on damages, we do not find it manifestly erred in awarding $57,500 in future general damages to Nicole.

2. Future Medical Expenses.
The jury awarded $7,600.00 in future medical expenses. This amount encompassed the cost for one year of treatment by Dr. Blackburn and participation in a coping skills class. Nicole contends the amount is inadequate and asks this court to increase the award to $160,453.00, which includes the estimated cost of psychiatric treatment for the remainder of Nicole's life.
This court in Veazey v. State Farm Mut. Auto Ins., 587 So.2d 5, 8 (La.App. 3 Cir.1991), discussed the burden of proof required to support an award for future medical expenses:
Future medical expenses, like any other damages, must be established with some degree of certainty. The plaintiff must show that, more probably than not, these expenses will be incurred. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. An award for future medical expenses cannot be based on mere speculation of the jury. Much stronger proof, such as medical testimony of the specific expenses to arise, should be required for such an award.
(Citations omitted.)
We cannot say the jury abused its discretion in awarding Nicole $7,600.00 for future medical expenses. Dr. Blackburn, whose testimony she relies on in asking for increased future medicals, could not unequivocally state how long she would require medical treatment. He testified as follows:
Based on the history we have now, the length of time that its continued, the treatment she's had, it would appear that she's going to continue to have pain for sometime. But again, myofascial pain, since we don't know how to treat it, we do know that in some cases it goes away spontaneously. It might go away in her spontaneously; it might not. That's the best guestimate I can give you.
Whether Nicole will require future medical treatment past one year is speculative at best. Future medical expenses must be proven with "some" degree of certainty or reasonable probability. We cannot say the jury abused its vast discretion.

3. Past Lost Wages.
Nicole also asserts it was error for the jury to award her only $206.00 for past loss of wages. She argues a minimum award of $52,539.00 in past lost wages is appropriate. The jury's award included the one week of work Nicole missed immediately following the accident. Defendants contend this award was well within the jury's discretion. After missing a week of work with Dr. Hayes' office immediately following the accident, Nicole worked for *903 two months until she lost her job, along with several other co-workers, because of a "general staff turnover." Nicole did not present any evidence to show she lost her pre-injury job because of the disabilities she sustained as a result of the accident. Nicole then applied for and began receiving unemployment benefits. When the benefits were exhausted, Nicole sought employment. She interviewed with a dentist, but chose not to return for a second interview. Instead, she opened a day care center at her house from November of 1995 through April of 1997, and cared for up to six children at a time. Nicole received $400.00 reimbursement per month from the state lunch program for the children who she cared for at her center. She also earned $350.00 per month total for watching the children. Although Nicole closed the day care center in April of 1997, she still watched her own children and the children of family members, and continued to collect funds from the state lunch program through April of 1999.
To recover actual wage loss, a plaintiff must prove he or she would have been earning wages, but for the accident in question. It is the plaintiff's burden to prove past lost earnings and the length of time missed from work due to the accident. ANMAC Foundation, Inc. v. St. Patrick Hospital of Lake Charles, 594 So.2d 951, 956 (La.App. 3 Cir.1992). Past lost earnings are susceptible of mathematical calculation from proof offered at trial, and an award for this element of damages is not subject to the much discretion rule. Ammons v. St. Paul Fire & Marine Insurance Co., 525 So.2d 60 (La.App. 3 Cir.), writ denied, 525 So.2d 1045 (La.1988).
After a thorough review of the record, we cannot say the jury erred in its award for past lost wages. Immediately after the loss of her job, Nicole applied for and began receiving unemployment benefits. Nicole acknowledged to qualify for unemployment benefits she had to certify that she was capable of working and was actively looking for work. After the unemployment benefits were exhausted, she opened the day care center. We also note the medical testimony concerning Nicole's ability to work was conflicting. Dr. Lea testified Nicole was capable of securing gainful employment. Dr. Snatic did not feel Nicole was physically able to return to work.
Although we may have weighed the evidence differently, we cannot say the award rendered by the jury for past lost wages was an abuse of its much discretion. The record shows a reasonable basis exists to support the jury's finding.

4. Future Lost Wages.
Before a plaintiff can recover for loss of future earning capacity, he or she must prove the loss, not with mathematical certainty, but with reasonable certainty. Gauthier v. Kansas City S.R. Co., 96-529 (La.App. 3 Cir. 11/6/96); 682 So.2d 993, writ denied, 96-2918 (La.1/24/97); 686 So.2d 867. Future loss of earnings is inherently speculative and must be proven with a reasonable degree of certainty; purely conjectural or uncertain future lost earnings will not be allowed. Perritt v. Commercial Union Ins. Co., 95-1274 (La. App. 3 Cir. 3/13/96); 673 So.2d 215, writ denied, 96-1751 (La.10/11/96); 680 So.2d 644. An award for loss of future earning capacity is not based merely upon the difference between the injured person's pre-accident wages and post-accident wages but rather it should be based on the difference between the injured person's earning capacity before and after the accident. Hollie v. Beauregard Parish Police Jury, 96-198 (La.App. 3 Cir. 8/28/96); 680 So.2d 1218.
The jury awarded $12,582.86 in future lost wages to Nicole, which when calculated equals approximately one year of her projected salary. The medical testimony supports the jury's award. Dr. Lea believed Nicole is capable of performing gainful employment "in some way, shape or fashion." Dr. Blackburn believed *904 Nicole will be able to perform "light-duty type work" after a "year or so" of treatment. Defendants presented a vocational rehabilitation counselor, Bob Gisclair, who administered tests to Nicole and interviewed her. After evaluating the tests and Nicole's medical history, he stated Nicole will be able to find numerous jobs in the sedentary to light-duty category. Mr. Gisclair noted that most of Nicole's prior employment fit within the sedentary to light-duty category.

5. Loss of Consortium.
It is well settled in Louisiana law that the elements in a claim for loss of consortium are: (1) society, including general companionship, affection, sexual relations; (2) support, which is lost family income that would go to support the uninjured spouse; and, (3) service, which is the uncompensated work around the house or educational help to the children, which presumably will have to be obtained from another source for a price as a result of the injury. Turner v. Smith, 556 So.2d 983 (La.App. 3 Cir.1990), writ not considered, 559 So.2d 1364 (La.1990).
The record reflects the marital relationship between Nicole and Steve was disrupted by the injuries sustained by Nicole. Steve was forced to perform the majority of the heavy household chores until recently when Nicole's mother moved in and began helping out. Nicole also was unable to participate in the recreational activities she shared with her husband and children to the same extent as before the accident. Nicole's mother testified Steve performed as mother and father to the children since the accident. Although the defendants presented evidence that Nicole and Steve's marital relationship was strained by his unilateral decision to have a vasectomy, the record also reflects Nicole's constant pain and resulting depression further strained their relationship. Regarding sexual intimacy, Steve stated:
I have three choices. I either don't have sex, I make love to a woman that's pilled up, or I make love to a woman and look in her eyes and see pain. It's not fun.
Accordingly, we find the jury abused its discretion in failing to make an award to Steve Thibodeaux for loss of consortium. We award him $10,000 for this loss. See Broussard v. Romero, 96-973 (La.App. 3 Cir. 2/26/97); 691 So.2d 1265, writ denied, 97-0670 (La.4/25/97); 692 So.2d 1092.

DECREE
For the foregoing reasons, the judgment is amended to award Steve Thibodeaux $10,000.00 for loss of consortium. In all other respects, the judgment is affirmed. Costs of this appeal are assessed equally to plaintiffs and defendant.
AFFIRMED, AS AMENDED.
DOUCET, C.J., dissents and assigns written reasons.
WOODARD, J., dissents in part and assigns written reasons.
DOUCET, Chief Judge, dissenting in part.
I respectfully dissent from the majority's decision to reverse the jury's decision to deny an award for loss of consortium. The majority has put itself in the place of the fact finder and conducted a de novo review of the record. This is not the role of the appellate court:.
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Arceneaux[ v. Domingue], supra[ 365 So.2d 1330] at 1333[ (La.1978)], Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985). In applying the manifestly erroneous-clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.
Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989)
*905 The appropriate question upon review is not whether support for an award of consortium can be found of record but whether the record provides a "reasonable factual basis" for the jury's conclusion that no award was appropriate:
Before reversing a jury's conclusions of fact, an appellate court must satisfy a two step process based on the record as a whole: There must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong. Stobart v. State, 92-1328 (La.4/12/93); 617 So.2d 880; Weatherford v. Commercial Union Ins., 94-1793, 94-1927 (La.2/20/95); 650 So.2d 763.
Guillory v. Insurance Company of North America, 96-1084, p. 5 (La.4/8/97); 692 So.2d 1029, 1032.
The majority herein chooses to ignore this standard of review and to grant an award for loss of consortium in spite of the fact that the record reveals "reasonable factual basis" for the jury's conclusion. The record indicates that Nicole continues to take responsibility for the majority of household duties. Steve's main basis for a claim of loss of consortium appears to be in regard to sex. However, the record is clear that the Plaintiffs' marital troubles began before the accident. As set out in the majority opinion, she told Dr. Hayes prior to the accident, that she was having marital problems, she cried all the time, couldn't sleep and had headaches. Dr. Hayes diagnosed reactive depression. Dr. Hayes testimony indicates that this kind of depression can not be expected to go away without counseling in addition to drug therapy. The record indicates that Nicole did not receive further treatment or counseling for her pre-accident depression. Her husband, when questioned about the pre-accident depression admitted only a mild disagreement over whether to have more children, and denied more extensive marital problems. He stated that he "didn't remember it being that much of a big deal." The evidence of record, especially concerning the pre-existing marital problems and Nicole's pre-existing depression, supports the jury's decision that Steve Thibodeaux did not suffer a loss of consortium as a result of the accident to Nicole.
Given the evidence presented to the jury on this subject, it is error for this court to conclude that the jury was clearly wrong or manifestly erroneous in deciding to credit one view of the evidence over another. The majority has plainly substituted its own evaluation of the record for reasonable inferences of fact made by the jury. Rosell, 549 So.2d 840. Accordingly, I disagree with the majority herein and would affirm the decision of the jury herein.
WOODARD, J., dissenting in part.
I respectfully dissent from that part of the majority's opinion awarding $10,000.00 for loss of consortium. While I agree that the evidence supports an award for loss of consortium, it is minimal. Therefore, I believe the award should be no more that $2,250.00.[1]
NOTES
[1] Plaintiffs did not appeal the jury's refusal to render loss of consortium awards to the minor children.
[2] Shortly after the October 14, 1994 visit, Nicole's position with Dr. Hayes' office was terminated. The reason given by Dr. Hayes was a general staff turnover.
[1] See Rowe v. State Farm Mut. Auto. Ins. Co., 95-669 (La.App. 3 Cir. 3/6/96); 670 So.2d 718, writ denied, 96-824 (La.5/17/96); 673 So.2d 611.