SCHOTT, Judge.
In these injunction proceedings plaintiff, Jon English, seeks to prevent defendants, Tulane University and the National Collegiate Athletic Association (NCAA), from declaring him ineligible to play football for Tulane on the basis of the NCAA rule regarding transfers by student athletes between schools. Upon filing his petition on September 2, 1983, plaintiff obtained a restraining order from the trial court which enabled him to play in Tulane’s first four games. After a hearing on September 29, the trial court denied plaintiff’s application for a preliminary injunction and recalled the restraining order. On September 30 plaintiff applied to this court for supervisory writs which were granted to issue a restraining order continuing the prohibition against Tulane and the NCAA from interfering with plaintiff’s participation as a football player and to convert plaintiff’s application to an expedited appeal from the trial court’s judgment of September 29.
Plaintiff graduated from high school where he had been an outstanding quarterback in the spring of 1979 and entered Michigan State University in the fall on a football scholarship. Realizing that his prospects for playing at Michigan State were poor he enrolled at Allegheny Junior College in Pittsburgh, Pennsylvania, in the summer of 1980. At that time his family resided in Pittsburgh and his father, Wally English, was on the coaching staff of the University of Pittsburgh. Plaintiff attended Allegheny during the 1980-1981 school year, graduating in the spring, and enrolled at Iowa State University in the fall of 1981. He was on the football team there for the 1981 and 1982 seasons. Once again he recognized that his prospects for playing at *1220 Iowa State were poor so he decided to make another move. His family was now residing in New Orleans where his father had taken the position as head football coach at Tulane. In January of 1983 plaintiff enrolled at Delgado Junior College in New Orleans and graduated from there in the spring. In August, 1983, he enrolled at Tulane where he sought to play football.
The NCAA is a private association of some 900 colleges and universities in the United States which regulates intercollegiate athletics. The member schools are committed to follow the rules of the NCAA regarding eligibility of players. Pertinent to this case are the following parts of Bylaws 5 — 1—(j) and 5-l-(k):
“(j) The student-athlete shall conform to the following eligibility provisions for all championships and in Divisions I and II for regular-season competition, practice and athletically related financial aid as indicated.
(7) A transfer student from a four-year institution shall not be eligible for any NCAA championship until the student has fulfilled a residence requirement of one full academic year (two full semesters or three full quarters), and one full calendar year has elapsed from the first regular registration and attendance date at the certifying Division I or Division II institution.
Ht ¾: * ⅜: ⅝: ⅜
(k) The student-athlete’s eligibility for NCAA championships is affected by, and the student-athlete must conform to, the following additional transfer provisions:
(1) A student who transfers from junior college after transferring from any four-year college shall complete one calendar year of residence at the certifying institution, unless the student:
(i) Has completed a minimum of 24 semester hours or a minimum of 36 quarter hours at the junior college following transfer from the four-year college, and one calendar year has elapsed since the transfer from the first four-year college, and, for Division I and Division II member institutions, has graduated from the junior college; or [Case No. 2931]
(ii) Returns to the four-year college from which the student transferred to the junior college, provided the student did not have an unfulfilled residence requirement at the time of the transfer from the four-year college. [Case No. 2941]”
While plaintiff was at Iowa State pondering his future he picked up a copy of a booklet published by the NCAA and entitled “NCAA Guide for the College-Bound Student-Athlete.” His attention was drawn to the following paragraphs in the section on “Eligibility”:
“3. A student who transfers to an NCAA member institution from a junior college after transferring from any four-year college must complete one calendar year of residence at the NCAA member institution in order to be eligible to NCAA championships or post-season football games, unless the student has completed a minimum of 24 semester or 36 quarter hours at the junior college following the student’s transfer from the four-year college and also has graduated from the junior college, and one calendar year has elapsed since the transfer from the first four-year college.
4. When a student has been in residence at two or more junior colleges, the terms of residence at all junior colleges may be combined in order to satisfy the residence requirements described in Paragraph Nos. 1, 2 and 3 of this section.” (Emphasis ours)
Although he was well aware of the general rule which is clearly designed to prohibit an athlete from playing for two different major colleges in successive years he perceived that the provisions of the booklet might be interpreted to declare him eligible to play at Tulane the following year on the theory that “the first four-year college” in his case was Michigan State and not Iowa State. However, plaintiff failed to read the following crucial language from the Introduction to the booklet:
*1221 “The information contained in this publication is designed to provide a general summary of NCAA rules and regulations in easy-to-read form to prospective student-athletes ....
This publication does not include all applicable provisions of NCAA legislation. Also, NCAA legislation may be subject to additional official interpretations when its application to specific situations is not readily apparent. Individuals should contact the NCAA national office if they have any questions about NCAA legislation.
Therefore, this pamphlet should be considered only as a guide to a general understanding of NCAA rules and regulations, with a view to avoiding involvement in a violation of NCAA legislation which might result in the loss of an individual’s eligibility or disciplinary action against a member institution.”
Although plaintiff testified that there was no question in his mind about his eligibility to play at Tulane the next year from the wording concerning “the first four-year college,” his father, Coach English, testified that his son called him and asked “if there was any possibility that he could be eligible at Tulane” after explaining how he had found the wording in the “student handbook” and his interpretation of the “first four-year college” language. Coach English testified that he told his son he didn’t know the answer but “would certainly check it out with our own rules interpreter at the university.” A day or two later Coach English having read the NCAA manual called on Ralph Petersen, Tulane’s NCAA liaison person, and asked him hypothetically, i.e., without identifying the problem as his son’s, if a player gone from a previous institution for a year and then attended a junior college would be eligible to play for Tulane. When given an affirmative response he reported to his son, “it was our feeling it was a good possibility he could be eligible.”
At this point plaintiff moved to New Orleans and enrolled at Delgado. Apparently Coach English had another conversation with Petersen within a month of the first in which he specifically alluded to his son and in April or May broached the subject with Tulane’s athletic director, Hind-man Wall, while the two were on a recruiting trip for the school. Wall testified unequivocally that he told English there was no way his son could be eligible. Nevertheless, he agreed to contact the NCAA for a ruling. A first letter by Petersen to the NCAA in April was answered by a staff person who flatly stated plaintiff was ineligible to play for Tulane in 1983. In May Wall signed a letter which had been prepared by plaintiff’s then counsel and in Tulane’s name advocated plaintiff’s position to the NCAA. This resulted in a telephone conference among the parties and the five person Administrative Committee of the NCAA in which plaintiff’s position was thoroughly considered and subsequently rejected by the committee. On July 15 the President of Tulane wrote the NCAA President and requested reconsideration by the Administrative Committee. This request was granted and the committee again ruled plaintiff ineligible.
Plaintiff appealed this ruling to the NCAA Council which heard his case on August 17, 1983. He was present and was accompanied and supported by his counsel, Wall and Tulane’s counsel. The Council affirmed his ineligibility. In the meantime, on August 7, plaintiff had begun to practice with the Tulane freshmen team which had the effect for the first time of precluding him from returning to Iowa State to play ball. On the day before the first game plaintiff initiated these proceedings and obtained the restraining order which enabled him to play.
In this court plaintiff contends that the trial court erred in denying him a preliminary injunction because 1) he was denied due process, 2) the NCAA’s actions in declaring plaintiff were capricious, arbitrary, unfair, and discriminatory, 3) plaintiff was the beneficiary of a stipulation pour autrui arising out of a contract between Tulane and the NCAA which stipulation was breached, 4) the NCAA was equitably es- *1222 topped from declaring plaintiff ineligible, and 5) the NCAA is a monopoly operating in violation of Louisiana law prohibiting combinations in restraint of trade.
Plaintiff’s due process argument is based on the theory that the NCAA did not adequately inform him of the rules regarding his eligibility. He argues that the rule as quoted in the NCAA Guide literally entitled him to play ball with Tulane in 1983 because a year had elapsed since his transfer from the first four-year college, Michigan State, in 1980. Thus, he attacks the interpretation placed on the rule by William Hunt, head of the NCAA’s Legislation and Enforcement Section, as being unreasonable in defining “first” to be the last four-year college. He argues further that the Guide’s references to residence and semester hours completed at junior colleges further confuse the transfer rule and create further ambiguity. Finally, he rejects the notion that he would have sought further interpretation of the rule even if he had read the introduction because it was so clear to him that he was eligible.
The record does not support this argument. First, it is clear from the testimony of plaintiff’s father, Coach English, that there was from the very beginning a question in plaintiff’s mind about his eligibility notwithstanding the way he wanted to read the rule. He was plainly aware of the underlying and laudable policy of the NCAA to prevent a student from playing for two different colleges in successive years. Second, while he pretends to a sincere belief that the rule plainly declared him eligible his first move after seeing the rule was to raise a question about it with his father who in turn raised questions about it with Petersen and Wall. He was squarely in the teeth of the Guide’s introduction, i.e., he had questions about NCAA legislation, and was obliged to contact the NCAA national office for answers. But he failed to avail himself of this opportunity. Instead, he embarked on a course which he knew was perilous and preferred to take a chance that somehow his interpretation might be accepted by the NCAA.
It is well to note here that plaintiff was determined to play for his father at Tulane if at all possible. His prospects at Iowa State, as at Michigan State previously, were poor and not at all conducive to his being considered for a professional football contract upon his graduation from college. He explained that his skills as a quarterback could be best developed under the tutelage of his father who was a pass oriented coach. Since this would be his last year of college ball it was important for him to make the most of it. Only his interpretation of the transfer rule would make all of this possible.
We find Hunt’s interpretation of the rule to be absolutely correct. The rule is dealing with a present college attempting to certify a player as eligible when he has played for a previous college. It contemplates two colleges, the first and the second. If one plays for a college one year he can’t play for another college the next year. He must sit out for a year after playing for the first college. The rule does not and need not concern itself with the bizarre kind of a situation where one had played for yet a third college in the distant past. Reduced to its simplest terms a player may not jump from one college to another in successive years. We repeat that plaintiff on his own and again after speaking to his father was generally aware of the rule’s meaning and while hoping to have found a loophole had questions about his theory.
Finally, plaintiff’s preoccupation with the rule’s junior college residence requirements is irrelevant. He is ineligible to play for Tulane in 1983 because he played for Iowa State in 1982. No further inquiry into his eligibility on the basis of his attendance at Allegheny Junior College and Delgado need to be made.
There is no support in the record for plaintiff’s contention that the NCAA was arbitrary, capricious, unfair, or discriminatory in dealing with his case. Had he inquired of the NCAA as to his plans before he left Iowa State he would have been told that he could not play at another college in *1223 1983. Some 900 colleges belong to the NCAA and thousands of players abide by its rules. They do so voluntarily apparently convinced that constraints on their freedom to move about from college to college are a fair price to pay for protection against the evils which would emerge from untrammeled recruiting practices and uncontrolled pirating of players among the colleges. The word “arbitrary” connotes acting without reason or judgment, Black’s Law Dictionary Revised Fourth Edition; or determined by whim or caprice, The American Heritage Dictionary of the English Language. “Capricious” is virtually synono-mous. The record reflects that the NCAA, in adopting and implementing the transfer rule at issue here acted quite reasonably in its efforts to prevent players from jumping from one school to another in successive years. Plaintiff was not dealt with unfairly. He was the victim only of his own plans and his own hope for special treatment. As to discrimination, Hunt testified that in all his years with the NCAA he never saw a case like plaintiff’s and plaintiff failed to produce proof of any case like his which would provide a basis for his charge. He did show that some years ago the NCAA adopted the present rule to add the “first four-year college” language to close a loophole which previously existed and which enabled players to move from one four year college to another in successive years, but this is not plaintiff’s situation and his charge of discrimination gets no support from these facts.
Plaintiff contends that he is the beneficiary of a stipulation pour autrui by virtue of a contract between Tulane and the NCAA pursuant to LSA C.C. Art. 1890 which provides as follows:
“A person may also, in his own name, make some advantage for a third person the condition or consideration of a commutative contract, or onerous donation; and if such third person consents to avail himself of the advantage stipulated in his favor, the contract cannot be revoked.”
As the trial judge correctly noted, this principle has no application if the benefit derived from the contract by the third party is merely incidental to the contract in question. HMC Management v. New Orleans Basketball Club, 375 So.2d 700 (La.App. 4th Cir.1979) writs refused 378 So.2d 1384 (La.1980). Tulane joined the NCAA long before plaintiff came on the scene. We need not recite the advantages accruing to the school and its fellow members in maintaining their association in the NCAA. Whatever benefits may flow to a player like plaintiff are purely incidental to the benefits flowing to the schools. Furthermore, it is difficult to understand how plaintiff can claim a breach of his rights as a beneficiary of Tulane’s membership in the NCAA when he injected himself into that relationship by taking advantage of a loophole which he pretended to perceive. In other words, while he was examining Tulane’s contract with the NCAA, he seized upon a part of it and tried to make himself a third party beneficiary of it. Yet while questioning that he qualified he failed to make an inquiry to the NCAA which, under the contract, was the proper party to whom such an inquiry was to be made. Art. 1809 has no application to such a matter.
In order for plaintiff to prevail on the doctrine of equitable estoppel he must show that there 1) was a representation made in the NCAA Guide that he could transfer and 2) he placed reasonable reliance on the representation. Even if we assume that the Guide in speaking of the “first four-year college” could be construed to mean Michigan State as opposed to Iowa State in plaintiff’s case it was unreasonable for him to rely on that interpretation. Since he had questions in his mind he was required by the Guide’s introduction to make an inquiry to the NCAA before he embarked on his transfer. His conduct was unreasonable and equitable estoppel does not lie.
Finally, plaintiff invokes the protection of R.S. 51:122 which provides that every contract in restraint of trade in this state is illegal. In HMC Management v. New Orleans Basketball Club, supra, we concluded that plaintiff failed to state a *1224 cause of action under the Louisiana Monopolies Law with respect to the National Basketball Association’s relationship to its club and players because the association and its member, the New Orleans Jazz, were engaged in interstate commerce in their operations and under Flood v. Kuhn, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1872) the field of interstate basketball had been preempted by federal law. It cannot be gainsaid that the NCAA is engaged in interstate commerce. Its essence is to deal with the athletic relationships among players and colleges throughout the United States. We agree with the trial court that R.S. 51:122 is inapplicable to plaintiff’s charge against the NCAA.
We hasten to add that even if it were, plaintiff’s specific complaint is with respect to the transfer rule and is analogous to the complaint considered in Chabert v. Louisiana High School Athletic Ass’n., 323 So.2d 774 (La.1975). There the court upheld a high school transfer rule reasoning that it was a reasonable rule designed to prevent the evils of recruiting. The same reasoning would apply to this case and leads to the conclusion that the NCAA transfer rule is a reasonable one deserving to be enforced.
We are confronted here with an appeal from the denial by the trial court of a preliminary injunction. Such a decision will be disturbed only in cases where a clear abuse of discretion has been shown. Picard v. Choplin, 306 So.2d 918 (La.App. 3rd Cir.1975). In the process of summarizing the evidence and analyzing plaintiff’s arguments we have already demonstrated that there was no abuse of discretion in this case. As the trial judge pointed out in his reasons for judgment, the trial court “indulged” plaintiff with every opportunity to prove his case and he failed to convince the court that he was entitled to further injunc-tive relief. We conclude that plaintiff has failed to show an abuse of the trial court’s discretion in dismissing plaintiff’s application.
Accordingly, the judgment appealed from is affirmed. The restraining order issued by this court on September 30, 1983, is recalled, vacated and set aside.
AFFIRMED.
RESTRAINING ORDER RECALLED.
BARRY, J., dissents with written reasons.