650 So.2d 763 (1995)
Mary Gail WEATHERFORD, et al.
v.
COMMERCIAL UNION INSURANCE, et al.
Nos. 94-C-1793, 94-C-1927.
Supreme Court of Louisiana.
February 20, 1995.
Paul P. Breaux, Jr., Breaux & Hornstein, St. Gabriel, for applicant in No. 94-C-1793 and respondent in No. 94-C-1927.
Daniel R. Atkinson, Jr., Mathews, Atkinson, Guglielmo, Marks & Day, Baton Rouge, for respondent in No. 94-C-1793 and applicant in No. 94-C-1927.
KIMBALL, Justice.[*]
In this consolidated automobile accident case, eight year old Thomas Weatherford was injured when he rode his bicycle into the path of a van driven by Father Mario Termini, a Roman Catholic priest associated with the Catholic Diocese of Baton Rouge. Plaintiffs sued Father Termini, the Catholic Diocese of Baton Rouge, Catholic Mutual Relief Society, and Virginia Surety Company. A jury found that Father Termini, who had previously been released from the suit, was not at fault, and the district court accordingly entered judgment in favor of the remaining defendants, the Catholic Diocese of Baton Rouge, Catholic Mutual Relief Society, and Virginia Surety Company. On appeal, the first circuit concluded the trial court committed manifest error in finding Father Termini free of fault but held that because Father Termini was not in the course and scope of his employment at the time of the accident, *764 the Diocese could not be held liable under the doctrine of respondeat superior.[1] Both plaintiffs and defendants sought writs of certiorari, which we granted to review the correctness of the court of appeal judgment.[2]
This case presents the threshold issue of whether the jury committed manifest error when it concluded that Father Termini did not cause plaintiffs' damages. After reading the record, we conclude the court of appeal erred when it held that the jury's verdict was manifestly erroneous. Because our decision on the threshold negligence issue is dispositive of this case, we need not address the issue of whether Father Termini was in the course and scope of his employment at the time of the accident.

I.

FACTS AND PROCEDURAL HISTORY
On Thursday, December 27, 1990, a damp and overcast day, Father Termini was traveling south on Louisiana Highway 75, a two-lane highway in Iberville Parish. Father Termini was driving his personally owned van at a speed of forty-five (45) to fifty (50) miles per hour and was en route to his rectory in Bayou Pigeon, Louisiana. Meanwhile, eight year old Thomas Weatherford and his fifteen year old uncle, Gary Weatherford, were riding their bicycles on Highway 75, also in a southerly direction. Thomas was riding a new twenty-inch bicycle, which he had received two days earlier for Christmas, and was travelling in the traffic lane reserved for north-bound traffic.
As Father Termini was rounding a large curve, near where Highway 75 intersects with Louisiana Highway 404, he began to look for oncoming cars, and as he approached the end of the curve, he saw Thomas riding his bicycle. The accident occurred when Thomas, who had been travelling southward in the north-bound lane, turned into Father Termini's lane of travel and was struck by Father Termini's van. Father Termini later testified that Thomas was wearing dark, patterned clothing which made it difficult for him to see Thomas until he noticed the boy was having trouble maneuvering his bicycle. He also testified that while he had no recollection of what he did immediately upon seeing Thomas, he believed he reflexively removed his foot from the accelerator and applied his brakes. Father Termini remembered locking his brakes at some point because his braking action caused him to hit his face against the van's windshield when the van ultimately came to rest against a nearby mailbox after the accident.
Testimony from Trooper Michael D. Noel, Jr., the Louisiana State Police officer who investigated the accident, established that Father Termini's van left one hundred and twenty-nine (129) feet of skid marks. The van skidded for approximately ninety-eight (98) feet before the impact and thirty-one (31) feet after the impact.
As a result of the accident, Thomas was severely injured.
On May 20, 1991, Mary Gail Weatherford, individually and in her capacity as tutrix for her minor children, Thomas D. Weatherford and Eunice Weatherford, filed this lawsuit claiming damages for personal injuries sustained by Thomas and for loss of consortium to herself and her daughter, Eunice. Mrs. Weatherford named Father Termini as a defendant along with Commercial Union Insurance Company, which was mistakenly named as Father Termini's insurer. Father Termini's actual insurer, American Employer's Insurance Company, was eventually made a party to this lawsuit. Also made defendants were the Catholic Diocese of Baton Rouge and the Diocese's insurers, Catholic Mutual Relief Society and Virginia Surety Company. Prior to trial, the plaintiffs settled with, and dismissed with prejudice, Father Termini and American Employers Insurance Company.
The case against the remaining defendants was set for trial on February 25, 1993, and the matter was tried over a two (2) day period. In all, the jury heard testimony *765 from fourteen (14) witnesses, including two accident reconstruction experts.
After closing arguments, the trial judge gave the following instruction concerning the duty of care a motorist owes when operating a vehicle in the vicinity of small children.
Louisiana law places the highest duty of care upon persons operating automobiles on highways in the vicinity of small children. The duty owed by a motorist to a child on or near the roadway is not discharged by merely reducing one's speed below the maximum limit. A driver may be negligent due to traveling at an excessive speed, even if driving at a speed less than the posted speed limit, if the circumstances require a reduction in speed.
A motorist encountering a child upon the roadside must anticipate that the child might be unable to appreciate the danger, is likely to be inattentive and might suddenly place himself in a position of danger. When a motorist observes a child of tender years along a highway he must bring his car under such control that he can stop and avoid an accident regardless of any unexpected or expected action on the part of the child. Every driver shall, when reasonably necessary to insure safe operation, give audible warnings with his vehicle horn to alert those in his vicinity of the potential danger ...[3]
After instructing the jury on the applicable law, the judge recessed the trial, and the jurors retired to deliberate. Sometime thereafter, the jurors informed the bailiff that they were interested in having the judge re-read a portion of the instructions. The jurors were then returned to the courtroom, where the jury foreperson made the following request:
We would like for you to read, if you would, the part [of the instructions] that discusses the obligation that a Louisiana motorist has, and what constitutes negligence in a situation such as this.
* * * * * *
We just need some more instruct[ion] on what constitutes negligence. What should Father [Termini] h[ave] done in this situation...
The judge then re-read the applicable instructions, and the jurors retired once more before returning a verdict in favor of the defendants by finding that Father Termini was not guilty of negligence.
Holding that the jury's verdict on the issue of liability was manifestly erroneous, the first circuit court of appeal concluded the evidence did not support a finding that Father Termini took every available means to apprise Thomas of his precarious position or to avoid the accident. The court of appeal noted that Father Termini should have blown his horn, applied his brakes to reduce his speed to below 45 miles per hour, or taken evasive action before Thomas rode his bicycle into his lane of travel and that the failure to take such measures constituted a breach of his duty to exercise greater than ordinary care upon observing a child on a bicycle in a perilous position on the road. Weatherford v. Commercial Union Ins. Co., 93-0841, pp. 3-7 (La.App. 1st Cir. 5/20/94), 637 So.2d 1208, 1210-11.

II.

ANALYSIS

A. Standard of Review
Article V § 10(B) of the Louisiana Constitution of 1974 provides that the appellate jurisdiction of a court of appeal extends to law and facts. The exercise of this jurisdiction, however, has been limited by the jurisprudential rule that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and *766 where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Stobart v. State, 617 So.2d 880 (La.1993); Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La.1990); Rosell v. Esco, 549 So.2d 840, 844 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La. 1978); Canter v. Koehring, 283 So.2d 716, 724 (La.1978), See also Sevier v. USF & G, 497 So.2d 1380, 1383 (La.1986), West v. Bayou Vista Manor, Inc., 371 So.2d 1146, 1150 (La.1979); Davis v. Owens, 368 So.2d 1052, 1056 (La.1979); Cadiere v. West Gibson Prods. Co., 364 So.2d 998, 999 (La.1978); A. Tate, "Manifest Error" Further Observations on Appellate Review of Facts in Louisiana Civil Cases, 22 La.L.Rev. 605, 611 (1962).
In Rosell, supra, we noted that if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse those findings even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Rosell, 549 So.2d at 844. Accord: Stobart, 617 So.2d 880. See also Housely v. Cerise, 579 So.2d 973 (La.1991); Sistler, 558 So.2d at 1112. As we recognized in Canter, 283 So.2d at 724, the foregoing principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record) but also upon the proper allocation of trial and appellate functions between the respective courts. Over the years, this court has steadfastly adhered to this principle. See Rosell, supra, Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825, 826 (La. 1987); Boulos v. Morrison, 503 So.2d 1, 3 (La.1987); Williams v. Keystone General Contractors, Inc., 488 So.2d 999 (La.1986); Johnson v. Insurance Co. of North America, 454 So.2d 1113 (La.1984); Berry v. Livingston Roofing Co., 403 So.2d 1247, 1249 (La. 1981); Crump v. Hartford Accident & Indemnity Co., 367 So.2d 300 (La.1979).
Moreover, in order to reverse a factfinder's determinations on the basis of manifest error, the court of appeal must satisfy a two-part test: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must also determine that the record establishes that the finding is clearly wrong. Stobart, 617 So.2d at 882.
After reviewing the record in this case in its entirety, we conclude the court of appeal failed to properly apply the appellate standard of review.

B. The Record
The record indicates the jury, after listening to all of the testimony and after seeing all of the evidence, was not clearly wrong and had a reasonable factual basis for concluding that Father Termini properly exercised the high duty of care he owed once he encountered Thomas Weatherford on Highway 75.
Because Father Termini testified he believed he reflexively took his foot off of the accelerator and immediately applied his brakes but could not recall his precise actions in the moments leading up to the accident, the testimony of the accident reconstruction experts was very important in the jury's determination of what took place immediately prior to the accident. Essentially, the jury was presented with two versions of the events leading up to the accident. One version was supplied by Mr. Gene Moody, the plaintiffs' expert, and the other version, which the jury accepted, was provided by Mr. Andrew J. McPhate, the defendants' expert. The jury's decision to give greater weight to Mr. McPhate's testimony should not have been reversed by the court of appeal in this case under the guise of manifest error. When findings of fact are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the findings of the trier of fact; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. See Rosell, 549 So.2d at 844.
Plaintiffs' expert, Mr. Gene Moody, testified that he visited the accident scene approximately two and one-half years after the accident and prepared a series of black and *767 white photographs to illustrate various distance measurements for the jury to determine when Father Termini should have seen Thomas Weatherford. According to Mr. Moody's photographs, Father Termini should have had an unobstructed view of the bicyclist from a distance of approximately five hundred feet. Moody theorized that when Father Termini initially saw Thomas, he simply took his foot off the accelerator and "coasted" until Thomas crossed into his lane of travel. Moody theorized that Father Termini then locked his brakes, and his van skidded for ninety-eight (98) feet before striking Thomas, and then skidded an additional thirty-one (31) feet before coming to rest against the mailbox. However, Moody conceded at trial, that based on Father Termini's trial testimony, it was no longer clear to him whether Father Termini had merely taken his foot off of the accelerator or whether Father Termini had immediately applied his brakes. However, for purposes of his analysis, Moody nonetheless assumed that Father Termini "coasted" until Thomas crossed over the center line. Moody did admit, however, that his account of the foregoing sequence of events was speculative and not readily susceptible of scientific verification.
While testifying on direct examination, Moody explained that he had relied upon Father Termini's deposition testimony to conclude that Father Termini had simply "coasted" and had not attempted to immediately apply his brakes upon seeing Thomas. On cross-examination, however, when the Diocese's attorney asked Moody to show him a specific deposition passage where Father Termini had admitted to "coasting," Moody could only find a statement where Father Termini said his "natural reflex would be to let up on the gas." Moody was then forced to admit to the jury that any driver's normal reaction before "hit[ting] the brakes" is to let up on the gas.
During the same cross-examination, the Diocese's attorney also attacked Moody's conclusion that Father Termini had coasted by having Moody read the following portion of Father Termini's deposition:
Q. Let me point you out to page six a response to a similar question [about Father Termini's reaction] in the deposition. It says, "The Witness" at the top.
A. Yes, sir.
Q. Can you read what his response was?
A. Yes, sir. (Reading from the deposition) "The Witness: Yes, a side to side motion because his bicycle seemed too big for him and all of a sudden he turned right in front of me. He veered right in front of me to my side of the road and I hit the brakes and I stopped against a mailbox on the rightthe right side of the road."
Moody was also forced to admit on cross-examination that his photographic evidence, which consisted of a series of black and white photographs of white posters, some of which had been mounted on a bicycle at various distances from the camera, and which had been taken two and one-half years after the accident, did not fairly and accurately depict what Father Termini saw at the time of the accident. This admission was based on the fact that Moody's photographs depicted a bicycle which was different from the one Thomas was riding at the time of the accident and which was positioned in a manner that did not reflect Thomas' position when Father Termini first saw him. In the following exchange, Moody, who actually needed a magnifying glass to see some of the details in his photographs, conceded that his photographs did not accurately reflect Thomas Weatherford's small size or the fact that Thomas was not riding across the roadway until the moment he turned into Father Termini's path:
Q. Would you not agree that by taking photographs at different frames, that the jury can take a snapshot and look at a scene, and that doesn't accurately reflect what was Father Termini's what he was ...
A. Well, in the photographs there's a white poster board as well as a bicycle. There's no child riding a bicycle.
Q. Well, I just saw you a minute ago, Mr. Moody, you had to get your magnifying glass to see the bicycle and see *768 how it was situated, right? (emphasis added)
A. Right. I was trying to determine how the bicycle was turned?
Q. Wouldn't it be easier to get a VCR, in color, in December, with a van the size of Father Termini's, get a kid the sizeeven Thomas Weatherford, put him on a twenty-inch bike over here with the same clothes he was wearing, go down the road filming at forty-five or fifty miles per hour? Wouldn't that be more accurate to let this jury know what the situation was?
A. Well
Q. Wouldn't that be more accurate than what we have here today.
A. Yes. Using a child that has the same clothes, the same bicycle assuming that you did it under the same lighting conditions, environmental conditions and so forth, yes, it could be more accurate depending on how you did it.
The foregoing exchange and other similar exchanges in this case's record highlight the reason for the rule, set forth in Canter, that because the trial court is in a better position to evaluate live witnesses, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. See Canter, 283 So.2d at 724.
Later in the trial, after Moody testified, the jury heard from the defendants' expert, Mr. Andrew J. McPhate. McPhate theorized that in the moments prior to the accident, Father Termini was traveling in a southerly direction along Highway 75 and was rounding a large "S" curve near the T-intersection where Highway 75 intersects with Highway 404. McPhate further theorized that Father Termini came upon Thomas Weatherford very suddenly and had little time to react. McPhate's theory that Father Termini did not see Thomas Weatherford until he was fairly close to the boy was based on Father Termini's testimony and the fact that when objects, like a bicycle, are moving away from one's field of vision, they are far more difficult to see and perceive than when such objects are moving transverse or across one's field of vision, as well as the fact that Thomas, who was wearing patterned clothing, blended easily into the surrounding scenery. McPhate theorized that upon noticing Thomas' movements, Father Termini applied his brakes, skidded for approximately ninetyeight (98) feet on the damp pavement, struck Thomas who by that time had crossed into his lane of travel, and skidded an additional thirty-one (31) feet before coming to rest against the mailbox.
In response to plaintiff's contention that Father Termini waited until Thomas was in his lane of travel before applying his brakes, McPhate testified that in his opinion Father Termini took his foot off of the accelerator as soon as he saw Thomas and immediately began making preparations to brake, but had definitely engaged his brakes by the time Thomas crossed the center line. McPhate admitted, however, that it was impossible to quantify the time frame from the moment when Father Termini initially took his foot off of the accelerator until the moment he applied the brakes.
Based on the expert testimony, as well as other evidence in the record, the jury could have reasonably concluded that Father Termini exercised the appropriate duty of care to avoid striking Thomas Weatherford and was not manifestly erroneous or clearly wrong to so conclude. Moreover, the fact that the jury, after listening to all the testimony as well as the judge's original instructions, deliberated on those instructions and the facts of this case before returning to the court-room for additional instructions is evidence that it took its responsibility very seriously. And, after making a factual determination concerning what happened in the moments preceding the collision, the jury concluded that Father Termini was not at fault in causing Thomas' injuries. The jury's verdict was not manifestly erroneous.

III.

CONCLUSION
For the foregoing reasons, we conclude the court of appeal incorrectly applied the appellate standard of review by failing to give due *769 regard to the jury's ability to interpret and discern the credibility of oral testimony.
Although we disagree with the court of appeal's analysis on the issue of liability, we nonetheless affirm that court's judgment in favor of defendants.
JOHNSON, J., dissents with reasons.
JOHNSON, Justice, dissenting.
I respectfully dissent from the conclusions reached by the majority in finding that defendant, Father Termini, was not negligent nor within the course and scope of his employment.
Where children are present on a road, the jurisprudence places the highest degree of care on a motorist, requiring him to take every available means to apprise the person in danger of his precarious position and at the same time exercise all possible maneuvers to avoid injury. Robertson v. Penn, 472 So.2d 927 (La.App. 1st Cir.1985), writ denied, 476 So.2d 353 (La.1985). The record does not contain evidence which supports that Father Termini exercised this high degree of care.
Testimony by Father Termini was that he was traveling between 45 and 50 miles per hour when he first noticed the eight-year-old minor, Thomas Weatherford. Mr. Gene B. Moody, a consulting engineer testified as plaintiff's expert in accident reconstruction. He stated that at the site of accident the speed limit was 45 miles per hour. Defendant's own testimony clearly indicates that he was traveling in excess of the legal speed limit. This action in and of itself proves that Father Termini breached his duty to maintain his speed within the limits imposed by state authorities.
Also, Louisiana state trooper Michael Noel investigated the accident. Officer Noel stated that there were a total of one hundred twenty-nine (129) feet of skid marks made by defendant's vehicle, with approximately thirty-one and one-half (31.5) feet made after impact. He further revealed that on the day of the accident the road was damp.
Father Termini further testified as follows, "`[A]s I approached the curve ... the first thing I saw was Thomas as he rode that bicycle, which was much too large for him is what caught my attention....'" See Weatherford v. Commercial Union Ins. Co., 637 So.2d 1208 (La.App. 1 Cir.1994) at 1211. Mr. Moody determined that the child was visible to the driver from four hundred ninety-four and one-half (494.5) feet away. At that point, defendant should have reduced his speed. It is evident that Father Termini was speeding on a damp road and noticed a child having problems controlling his bicycle. Yet, he is unsure if he applied his brakes upon seeing the child, but believed he let his foot off of the accelerator as a natural reflex. The record is devoid of any evidence which shows that the driver blew his horn or took other evasive measures to avoid the unfortunate accident.
Keeping within the standards of Robertson, Father Termini should have blown his horn to get the child's attention, applied his brake to reduce his speed and pulled his vehicle away from the direction of the child. Obviously, Father Termini failed to carry out these duties; therefore, his actions were NEGLIGENT (emphasis added) and to hold otherwise is manifestly erroneous.
Our jurisprudence holds that an employer is liable for a tort committed by his employee if, at the time, the employee is acting within the scope of his employment. LeBrane v. Lewis, 292 So.2d 216 (La.1974). The test to determine if an employee is within the course and scope of his employment during a given incident is whether the employee's tortious conduct was so closely connected in time, place and causation to his employment duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interest. Daniels v. Conn., 382 So.2d 945 (La.1980).
Catholic priests have certain duties imposed upon them because of their profession. Among these duties are presiding over Sunday and Daily masses, Novenas, weddings, hearing confessions, performing baptisms and delivering last rights. Additionally, it is customary for priests to visit individuals who are unable to attend mass because of their *770 health or other prohibitory reasons. Where these duties are performed as a function of their employment, the test described in Daniels dictates that the priest's employer would be responsible if a tort occurs. At the time of the accident, the record revealed that Father Termini was returning from visiting an elderly gentleman whom he had just counseled in his capacity as a Roman Catholic Priest possibly cloaked in his "clerical garb". Although Father Termini testified that the accident occurred on a Thursday, his regular day off, the facts clearly indicate that he was exercising his "spiritual duties" entrusted upon him because of his employment as a priest.
In reaching the conclusion that Father Termini was not within the "course and scope" of his employment, the lower courts relied upon defendant's self-serving testimony, as well as on the testimony of Reverend Paul Counce, the Diocese's expert on internal church law. Both priests stated that it was Father Termini's day off and his counseling was not as a representative of the Diocese.
Assuming arguendo, that Father Termini suffered extensive injuries which exceeded the limits of his insurance carrier, in all likelihood, his testimony would have been different under these circumstances and his counsel would have argued that he was within the course and scope of his employment because he decided to work on his usual "off" day. The only evidence which supports the finding of no liability on the part of the Diocese originated from pure subjective testimony, the testimony of defendant's employees.
The appellate court properly determined that the defendant, Father Termini, was negligent. Additionally, the record sufficiently supports the fact that Father Termini was within the course and scope of his employment at the time of the accident which makes the Diocese vicariously liable for his actions.
NOTES
[*] Pursuant to Rule IV, Part 2, § 3, Dennis, J., was not on the panel which heard and decided this case.
[1] Weatherford v. Commercial Union Ins., 93-0841, (La.App. 1st Cir. 5/20/1994); 637 So.2d 1208.
[2] Weatherford v. Commercial Union Ins., 94-1793, 94-1923, (La. 11/4/1994); 644 So.2d 1062.
[3] The trial court's jury instruction comports with Louisiana jurisprudence. See Buckley v. Exxon Corp., 390 So.2d 512 (La.1980); Dufrene v. Dixie Auto Ins., 373 So.2d 162 (La.1979); McCandless v. Southern Bell, 239 La. 983, 120 So.2d 501 (1960); Brown v. Liberty Mut. Ins., 234 La. 860, 101 So.2d 696 (1958); Scardina v. State Farm Ins., 597 So.2d 1148 (La.App. 1st Cir.), writ denied 604 So.2d 1004 (La.1992); Moore v. State Farm Ins., 499 So.2d 146 (La.App.2d Cir.1986); Dorsey v. Williams, 525 So.2d 542 (La.App.3d Cir.1988); Torres v. USF & G, 499 So.2d 1293 (La.App. 4th Cir.1986).