691 So.2d 324 (1997)
John Patout BRENNAN
v.
BOARD OF TRUSTEES FOR UNIVERSITY OF LOUISIANA SYSTEMS.
No. 95 CA 2396.
Court of Appeal of Louisiana, First Circuit.
March 27, 1997.
*325 Murphy Foster, III, Baton Rouge, for Plaintiff-Appellee John Patout Brennan.
Cecilia Woodley, New Orleans, for Intervenor-Appellant National Collegiate Athletic Association.
Winston Decuir, Baton Rouge, for Defendant-Appellant Board of Trustees for the University of Louisiana Systems.
Before LOTTINGER, C.J., and SHORTESS, FOIL, GONZALES and FOGG, JJ.
LOTTINGER, Chief Judge.
Plaintiff, John Patout Brennan (Brennan), a student-athlete at the University of Southwestern Louisiana (USL), tested positive for drug use in the second of three random drug tests administered by the National Collegiate Athletic Association (NCAA). Brennan requested and received two administrative appeals in which he contended that the positive test results were "false" due to a combination of factors, including heavy drinking and sexual activity the night before the test, and his use of nutritional supplements. Following the unsuccessful appeals, USL complied with the NCAA regulations and suspended Brennan from intercollegiate athletic competition for one year. Brennan brought this action against USL's governing body, the Board of Trustees for University of Louisiana Systems (Board of Trustees), seeking to enjoin enforcement by USL of the suspension.
In his petition, Brennan alleged that, by requiring him to submit to the NCAA's drug testing program, USL violated his right of privacy and deprived him of a liberty and property interest without due process in contravention of Article I, Sections 2 and 5 of the Louisiana Constitution. The NCAA moved to intervene on the grounds that the drug testing policies and procedures that Brennan placed at issue were developed, administered, conducted and enforced by the NCAA. The intervention was granted.
Following a two day trial, the trial judge entered oral reasons for judgment. Initially, the trial judge stated that he would "pretermit any consideration of the several constitutional issues ... since those issues are mooted by the court's decision." The trial judge then concluded that Brennan was entitled to the preliminary injunction because "the subject *326 test results on the plaintiff based on the one blood sample taken from him was flawed, and therefore that sample should not have been the basis of ... disciplinary action against the plaintiff...."[1]
The Board of Trustees and the NCAA appealed and assigned the following error:
Having declined to address the only causes of action asserted by Brennan, and having failed to find that Brennan was likely to succeed on the merits of any other cognizable cause of action, it was improper for the district court to issue a preliminary injunction in favor of Brennan.

VALIDITY OF THE DRUG TEST
Prior to discussing the assignment of error, it is necessary to review the trial judge's finding that the drug test results were flawed.
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Weatherford v. Commercial Union Insurance, 94-1793, 94-1927, p. 5 (La. 2/20/95); 650 So.2d 763, 765-66; Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). If the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse those findings even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Weatherford, 650 So.2d at 766; Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Ferrell v. Fireman's Fund Insurance Co., 94-1252, p. 4 (La. 2/20/95); 650 So.2d 742, 745-46; Rosell, 549 So.2d at 844. When findings are based on determinations regarding the credibility of witnesses, the manifest error/clearly wrong standard demands great deference to the trier of fact's findings. Ferrell, 650 So.2d at 746; Rosell, 549 So.2d at 844. An appellate court may find manifest error or clear wrongness in a finding purportedly based upon a credibility determination where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story. Ferrell, 650 So.2d at 746; Stobart, 617 So.2d at 882. This principle of review is based not only upon the trial court's better capacity to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts. Weatherford, 650 So.2d at 766.
In order to reverse a factfinder's determinations on the basis of manifest error, the court of appeal must satisfy a two-part test: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must also determine that the record establishes that the finding is clearly wrong. Weatherford, 650 So.2d at 766; Stobart, 617 So.2d at 882.
After reviewing the record in this case in its entirety, we conclude that the trial judge committed manifest error in finding that the drug test results were flawed.[2] The trial judge gave the following oral reasons:
The court finds that the T/E test performed on Mr. Brennan, the plaintiff in this case, was flawed with respect to its application and interpretation with respect to Mr. Brennan. He was ingesting dietary supplements. He had consumed alcohol the night and early morning of the test, had engaged in sexual conduct, or as he *327 testified "had sex," all of which could have caused an aberration of the T/E ratio to cause it to produce a false positive reading.... The intervenor NCAA's own expert [Dr. Don Catlin] agreed that a more accurate procedure than that used in this case would be to take another urine sample from the subject some few days after the original urine sample, that is long enough after the first sample to preclude any false positive result due to the influencing factor[s] of sex, alcohol over-the-counter dietary supplements, et cetera, which would be somewhat transient, but soon enough after the original sample to preclude a negative result if the plaintiff was actually taking [anabolic] steroids. It was Dr. Catlin. He estimated, as I recall, that this period was to be at least three weeks from the date of the last taking of some antibiotic [sic] steroids within which the ratio would still result in a positive finding. In this case only one sample was taken, divided into two parts and each part tested at different times with somewhat different results, which shows two things; the sensitivity of the test as well as the correctness of the premise of the court and Dr. Catlin that an aberration in the test causing a false positive for such activities as sex, consumption of alcohol and ingestion of dietary supplements, would likely be resolved by a taking of a further sample within the prescribed period of time to eliminate any question regarding a transient aberration of the test result. This [was] not done, but should have been. And Dr. Catlin candidly admitted that the procedures could be improved by that type of sampling.
Clearly, the trial judge's conclusion that the test results were flawed was based largely on the testimony of Dr. Don Catlin, an expert in testing for testosterone and the use of the T/E ratio. However, upon reviewing the record, Dr. Catlin's testimony does not support the trial judge's conclusions.
Initially, we note that Dr. Catlin was of the opinion that sexual activity and the consumption of alcohol does not increase the T/E ratio so as to create a "false positive." While admitting that re-testing would produce more accurate results in some situations, Dr. Catlin was clear that such re-testing was unnecessary in the present case. Dr. Catlin noted that three separate tests were performed on samples taken from Brennan on March 17, 1994, November 10, 1994 and February 15, 1995. The results of these three tests established a T/E ratio pattern of low/high/low. Dr. Catlin testified that the low test results on the third sample confirmed his opinion that plaintiff had been exposed to testosterone between the March 17 and November 10, 1994 tests. When questioned by the court, Dr. Catlin stated that "[i]deally one would like to have a sample every two or three weeks to see the pattern." However, Dr. Catlin indicated that, in this particular case, a pattern had been established and based upon this pattern, he was of the opinion that Brennan had been exposed to testosterone.
Regarding the different results on the November 1994 urine specimen[3], Dr. Catlin clarified that there was "no significant difference" between the results of the two tests performed. According to Dr. Catlin the 12% difference in the results was within an acceptable scientific range given that the sample was analyzed by different people, on a different day and with different instruments.
The testimony of Brennan's own experts further supports our conclusion that the trial judge was clearly wrong. Dr. John Holbrook and Dr. William George, the two experts in pharmacology who testified on behalf of Brennan, opined that sex and the consumption of alcohol could increase the T/E ratio. While both experts cited only one study involving seven subjects to support their contention that alcohol could increase the T/E ratio, neither expert could cite any study to support the proposition that sexual activity elevates the T/E ratio. Significantly, both experts stated that sex and alcohol alone could not have caused the significant increase in Brennan's T/E ratio. Both experts testified *328 that the nutritional supplements taken by Brennan likely contained testosterone. Additionally, Dr. George stated that Brennan's increased T/E ratio was consistent with Brennan having used the nutritional supplements which likely contained testosterone.
The trial judge also gave these reasons for concluding that the test results were flawed:
An additional reason for the court's feeling that there was an aberration or a false reading on the subject test with respect to Mr. Brennan is the testimony of Dr. LeBlanc, the team physician who examined Mr. Brennan almost contemporaneously with the subject test and who testified that his blood testing was within normal limits, and in addition and more importantly, that Mr. Brennan did not fit the profile of a person using antibiotic [sic] steroids....
The record reveals that the blood test taken by Dr. LeBlanc was not contemporaneous with the NCAA testing. The blood test was performed approximately one month after Brennan submitted the urine sample to the NCAA. The blood test indicated normal testosterone levels. As noted by Dr. Catlin, and unchallenged by any other witness, evidence of testosterone use may be undetectable after this length of time.
Upon close review, we find that the record does not contain a reasonable factual basis for the trial judge's conclusion that the test results were flawed. According to the experts, sex and alcohol alone could not have caused the drastic increase in Brennan's T/E ratio. Brennan admitted to taking nutritional supplements which likely contained testosterone. Experts testified that Brennan's elevated T/E ratio was consistent with having consumed nutritional supplements which likely contained testosterone. The pattern established by Brennan's three drug tests indicated that he had been exposed to testosterone. Considering the evidence contained in the record, we conclude that the trial judge was clearly wrong in finding that the test results were flawed.

PRELIMINARY INJUNCTION
Having concluded that the trial judge erred in finding that the test results were flawed, we now consider whether it was proper to issue a preliminary injunction in favor of Brennan. Generally, a party seeking issuance of a preliminary injunction must show irreparable injury if the injunction does not issue. Doug Reed Enterprises, Inc. v. City of Baton Rouge, 591 So.2d 733, 735 (La.App. 1st Cir.1991). He must also show that he is entitled to the relief sought and he must make a prima facie showing that he will prevail on the merits of the case. Id. A showing of irreparable injury is not necessary when the deprivation of a constitutional right is involved. Id.

A. BRENNAN'S CONSTITUTIONAL CLAIMS
Brennan claims that his constitutional rights to privacy and due process were violated. The Louisiana Constitution's protection of privacy provisions contained in Article 1, § 5 does not extend so far as to protect private citizens against the actions of private parties. Carr v. City of New Orleans, 622 So.2d 819, 822 n. 3 (La.App. 4th Cir.), writ denied, 629 So.2d 404 (La.1993). Nor do the due process provisions of Article 1, § 2 provide a cause of action against private actors. Delta Bank & Trust Company v. Lassiter, 383 So.2d 330, 334 (La.1980). Thus, in order to prevail on the merits of either constitutional claim, Brennan must first show that USL was a state actor when it enforced the NCAA's rules and recommendations.

1. State Action
In National Collegiate Athletic Association v. Tarkanian, 488 U.S. 179, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), the United States Supreme Court noted that a state university's imposition of sanctions in compliance with NCAA rules and regulations constituted state action. In that case, the University of Nevada, Las Vegas (UNLV), a state university, notified its head basketball coach, Jerry Tarkanian, that he was to be suspended from its basketball program because the NCAA found that he had violated its rules. Tarkanian filed suit against UNLV and the NCAA seeking to prevent his suspension *329 alleging causes of action under the Fourteenth Amendment to the United States Constitution. Tarkanian, 488 U.S. at 181, 109 S.Ct. at 456. The lower court issued an injunction barring UNLV from disciplining Tarkanian and enjoined the NCAA from conducting any further proceedings against the university. Tarkanian, 488 U.S. at 188, 109 S.Ct. at 460. The NCAA appealed. UNLV did not appeal since the injunction allowed it to keep its winning basketball coach.
The precise issue before the Supreme Court was whether a state university's actions in compliance with NCAA rules turns the NCAA's conduct into state action. Tarkanian, 488 U.S. at 193, 109 S.Ct. at 462. The Court began its analysis by first noting that UNLV, a state university, was "without question a state actor" which must comply with the terms of the due process clause when imposing sanctions on a tenured employee. Tarkanian, 488 U.S. at 192, 109 S.Ct. at 462. The Court then considered whether the NCAA was also a state actor. After thoroughly examining the relationship between UNLV and the NCAA the Court concluded that the NCAA was not a state actor. Tarkanian, 488 U.S. at 192-99, 109 S.Ct. at 462-66.
In the present case, Brennan asserts that USL, not the NCAA, violated his constitutional rights to privacy and due process. Without question, USL is a state actor even when acting in compliance with NCAA rules and recommendations. While we conclude that there is state action in this case, the preliminary injunction could only be issued on the constitutional claims if Brennan made a prima facie showing that he had a privacy interest which was invaded or that he had a property or liberty interest which was entitled to due process protection.

2. Brennan's Privacy Interest
In determining whether USL violated Brennan's right of privacy, we are guided by the California Supreme Court's recent decision in Hill v. National Collegiate Athletic Association, 7 Cal.4th 1, 26 Cal.Rptr.2d 834, 865 P.2d 633 (Cal.1994). Therein several student-athletes filed suit against the NCAA challenging its drug testing program as an invasion of the right of privacy. Id. 26 Cal. Rptr.2d at 838-39, 865 P.2d at 637. While the court recognized that the drug testing program impacts privacy interests, it reasoned that there was no constitutional violation when the student-athletes' lower expectations of privacy were balanced against the NCAA's countervailing interests. Id.
After discussing aspects of communal undress, the necessity of physical examinations, as well as the fact that student-athletes share personal information with their coaches and trainers on a routine basis, the court concluded that student-athletes have a diminished expectation of privacy. Id. at 859-60, 865 P.2d at 658. The court further noted that:
Drug testing has become a highly visible, pervasive, and well accepted part of athletic competition, particularly on intercollegiate and professional levels. It is a reasonably expected part of the life of an athlete, especially one engaged in advanced levels of competition, where the stakes and corresponding temptations are high.
The student athlete's reasonable expectation of privacy is further diminished by two elements of the NCAA's drug testing programadvance notice and the opportunity to consent to testing.
Id. at 860, 865 P.2d at 658-59. Balanced against the diminished privacy interests of the student-athletes, the Hill court found that the drug testing program was reasonably calculated to further the NCAA's interests of safeguarding the integrity of intercollegiate athletic competition and in protecting the health and safety of student-athletes. Id. at 838-39, 865 P.2d at 637.
Although Brennan filed suit against USL, the state actor, rather than the NCAA, we conclude, as did the court in Hill, that there was no violation of a privacy interest. Brennan, like the student-athletes in Hill, has a diminished expectation of privacy. Additionally, we note that USL shares the NCAA's interests in ensuring fair competition in intercollegiate sports as well as in protecting the health and safety of student-athletes. While a urine test may be an invasion of privacy, in this case, it is reasonable considering the diminished expectation of privacy in the context of intercollegiate sports and *330 there being a significant interest by USL and the NCAA that outweighs the relatively small compromise of privacy under the circumstances.
Because Brennan could not make a prima facie showing that he had a privacy interest which was unjustly violated, he could not prevail on the merits of the right of privacy claim.

3. Brennan's Property or Liberty Interest
To prevail on the due process claim, Brennan must show the existence of some property or liberty interest which has been adversely affected by state action. Delta Bank & Trust Company v. Lassiter, 383 So.2d at 334. However, it is clear that participation in intercollegiate athletics is not a property right, but is a privilege not protected by Constitutional due process safeguards. See Marino v. Waters, 220 So.2d 802, 806 (La.App. 1st Cir.1969); Louisiana State Board of Education v. National Collegiate Athletic Association, 273 So.2d 912, 916 (La. App. 3rd Cir.1973). Because a student-athlete has no liberty or property interest in participating in intercollegiate athletics, Brennan could not make a prima facie showing that he would prevail on the merits of his due process claim.
In sum, Brennan could not make a prima facie showing that he would prevail on the merits of either constitutional claim; therefore, these claims could not be the basis for the issuance of the preliminary injunction.

B. BRENNAN'S TORT CLAIM
Although Brennan could not prevail on the constitutional claims, he contends that the factual allegations in his petition are sufficient to support a cause of action in tort. In brief, Brennan asserts that "[t]he evidence introduced at the trial of the preliminary injunction established beyond question that USL had an affirmative `duty' to provide Mr. Brennan with certain material and information concerning the potential consequences of using over-the-counter nutritional supplements, engaging in sexual activity and drinking alcohol on one's T/E ratio before attempting to obtain Mr. Brennan's `consent' to be tested." The Board of Trustees and the NCAA assert that the preliminary injunction could not issue on the tort theory for three reasons: (1) USL had no duty to warn student-athletes not to ingest nutritional supplements containing unknown substances; (2) the damage, which Brennan contends USL caused him ineligibility for one year, is not a risk within the scope of any duty that was allegedly owed to Brennan; and (3) the record establishes that USL in fact provided sufficient information and warning to apprise student-athletes of the risk of disqualification under the NCAA drug testing program.
Assuming, for purposes of discussion only, that USL had a duty to warn Brennan, the record establishes that Brennan received adequate information and warnings to protect his eligibility. The only evidence to support Brennan's assertion that he did not receive adequate information or warnings concerning the NCAA's drug testing program, and specifically warnings against the ingestion of nutritional supplements, was Brennan's own testimony. Although he stated that he was never offered or given a copy of the NCAA manual or provided an explanation of the NCAA rules regarding testosterone testing, Brennan admitted to signing an NCAA drug testing consent form approximately four months before the subject drug test. The consent form advised that in signing the document Brennan was affirming his awareness of the NCAA's drug testing program and that he had been "provided an opportunity to review the procedures for NCAA drug testing that are described in the NCAA Drug-Testing Program brochure." Another document submitted as evidence entitled "Student-Athletes' Affirmation of Eligibility" affirms that in connection with the administration of the student-athlete drug testing consent form, USL provided each athlete "a copy of the summary of NCAA Regulations, an opportunity to ask questions about NCAA regulations and an opportunity to review the NCAA Manual."
In addition to the documentary evidence, John Porche, USL's director of sports medicine and head athletic trainer, testified without contradiction that he meets with the football *331 team each fall to explain the drug testing program and give them this warning:
And NCAA comes in and that they test for banned substances. Should you test positive on [an] NCAA test, you're banned for a year. They really don't care what you take. If it's banned, it's banned. And if you have any doubt, if you have prescription medicine or nonprescription, if you have anything in the body you should check with me before taking.
Although Brennan could not specifically recall Mr. Porche's warnings, he admitted to attending three such meetings and conceded that it was possible that he received this warning.
While Brennan claimed not to have received adequate information or warnings, the overwhelming evidence supports a conclusion to the contrary. According to the documentary evidence, Brennan was aware of and given the opportunity to review the NCAA drug testing program, he was provided a summary of NCAA rules, given an opportunity to ask questions about the rules and to review the NCAA manual. Brennan was told to inquire of the USL athletic department before taking anything at all, prescription or non-prescription. Thus, the only possible basis for a tort claim was USL's failure to specifically warn against taking nutritional supplements. However, in light of the warnings which were given by USL and the information which was received by Brennan, we cannot say that the relevant jurisprudence supports a finding that USL was negligent in failing to specifically warn against consuming nutritional supplements.
In Fox v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 576 So.2d 978, 982 (La. 1991), the Louisiana Supreme Court acknowledged that universities no longer stand in loco parentis to their students, noting that attempts to foster the educational process and the growth and maturation of students has relieved universities of many of their protective duties. Today's "college student is considered an adult capable of protecting his or her own interests; students today demand and receive increased autonomy and decreased regulation on and off of campus." Id. (quoting University of Denver v. Whitlock, 744 P.2d 54, 59-60 (Colo.1987)); Pitre v. Louisiana Tech University, 95-1466, 95-1487, p. 21 (La. 5/10/96), 673 So.2d 585.
Facts similar to this case were presented in English v. National Collegiate Athletic Association, 439 So.2d 1218 (La.App. 4th Cir.), writ denied, 441 So.2d 747 (La.1983). In English, the student-athlete argued that because he did not receive adequate notice of the NCAA's transfer rule, the NCAA could not enforce the rule against him. The court found that the student, who had reviewed an NCAA publication entitled "NCAA Guide for the College-Bound Student-Athlete," was put on notice that such a rule existed and was responsible for inquiring further into the rule. Id. 439 So.2d at 1220. The introduction to the guide informed the reader that he should contact the NCAA national office with any questions. Id. at 1221. The court found that the student "failed to avail himself of this opportunity. Instead, he embarked on a course which he knew was perilous and preferred to take a chance that somehow his interpretation might be accepted by the NCAA." Id. at 1222. The court noted that had the student sought further information about the transfer rule, he would have received information that his intended course of action would cause him to be ineligible. Id. at 1222-23.
In the present case, Brennan affirmed that he was aware of the NCAA's drug testing policy. He was told verbally and in writing to inquire about the program if he had any questions. Brennan was told that if he was taking anything at all, prescription or non-prescription, to check with the USL athletic department. Although Brennan had ample opportunity to inquire about ingesting nutritional supplements, he choose to ingest the supplements without seeking advice from anyone.
According to Fox and Pitre, USL does not stand in loco parentis and Brennan is considered an adult capable of protecting his own interests. Considering the information provided to Brennan regarding the NCAA's drug testing program and the warnings provided by USL, Brennan had sufficient information to protect his eligibility. USL was *332 not negligent in failing to specifically warn against taking nutritional supplements.

CONCLUSION
For the foregoing reasons, the judgment of the trial court issuing the preliminary injunction is reversed. Costs of this appeal are assessed against the appellee.
REVERSED.
FOGG, J., dissents and assigns reasons.
FOGG, Judge, Dissenting.
I respectfully dissent. The plaintiff/appellee filed a Motion to Dismiss Appeal with this court on December 19, 1996. Therein, the plaintiff/appellee stated that he originally filed suit to obtain an injunction against USL's enforcement of a NCAA ruling that he was ineligible to participate in intercollegiate athletic competition. In association with that motion, the plaintiff/appellee filed with this court an affidavit wherein he stated that "as of the end of the 1996 football season on November 16, 1996, he has exhausted all of his eligibility under National Collegiate Athletic Association Rules and may no longer play inter-collegiate football." He argued that, because he is no longer eligible to participate in sports governed by the NCAA, the instant appeal is moot.
In his original petition, the plaintiff prayed solely for injunctive relief. The record contains no pleading filed by USL, the sole defendant named in the petition. Subsequently, NCAA was granted leave of court to intervene as a defendant in the lawsuit. In its intervention, NCAA raised no new issues.
Therefore, the only issue in this lawsuit is whether USL should be enjoined from enforcing the NCAA's ruling that the plaintiff was ineligible from participating in intercollegiate athletic competition. A review of the caselaw supports the plaintiff's contention that a case in this posture lacks a justiciable issue and should be dismissed as moot. In the case of Whitney Nat. Bank of New Orleans v. Poydras Center Associates, 468 So.2d 1246, 1248 (La.App. 4 Cir.1985), the court stated:
In cases of injunctive relief, it is clear that when the activity which a plaintiff seeks to enjoin has already occurred during the pendency of the suit, the matter is moot and the propriety of the trial court's action in denying or granting the injunction will not be considered by the reviewing court. City Stores v. Gervais F. Favrot Co., Inc., 315 So.2d 370 (La.App. 4th Cir.1975), writ denied 320 So.2d 557; Boothe v. Board of Supervisors of Elections for the Parish of Catahoula, 341 So.2d 1297 (La.App. 3rd Cir.1977).
This rule was succinctly stated by our Supreme Court in Verdun v. Scallon Brothers Contractors, Inc., 263 La. 1073, 270 So.2d 512 (1972). In that case an injunction was sought to prevent a contractor from trespassing on plaintiff's property to remove soil for the purpose of repairing an adjacent levee. By the time the Supreme Court considered the matter, all construction activities had ceased. The Court dismissed the appeal stating:
"In such circumstances, the matter is now moot, as this court will not review a case where only injunctive relief is sought when the need for that relief has ceased to be a justiciable issue. Injunction, may be used to prevent but not to correct the wrong; it cannot be employed to redress an alleged consummated wrong or undo what has already been done." 270 So.2d at 513.
E.g., Richardson v. Reeves, 600 So.2d 138 (La.App. 2 Cir.1992); Savings Bank of Baltimore v. Venture 73, 452 So.2d 395 (La.App. 3 Cir.), writ denied, 458 So.2d 487 (La.1984).
For these reasons, I would grant the appellee's motion to dismiss.
NOTES
[1] The test was actually performed on a urine sample, not a blood sample.
[2] Brennan tested positive for the anabolic steroid testosterone. Testosterone that is introduced into the body from external sources (exogenous testosterone) appears in the urine. To identify the presence of exogenous testosterone the urine is tested to measure the ratio of testosterone to another hormone called epitestosterone (the T/E ratio). The NCAA has adopted a 6 to 1 ratio as a standard for a positive test result for the presence of exogenous testosterone.
[3] The November 1994 urine specimen collected from Brennan was divided into two samples, an A sample and a B sample. Testing of the A sample revealed a T/E ratio of approximately 12 to 1. Testing of the B sample revealed a T/E ratio of approximately 10 to 1.