707 So.2d 1308 (1998)
Jason E. HARKINS, Plaintiff-Appellant,
v.
Father Gilbert GAUTHE, et al., Defendants-Appellees.
No. 97-912.
Court of Appeal of Louisiana, Third Circuit.
February 4, 1998.
Writ Denied April 24, 1998.
James Paul Lambert, James Lowell Landry, Jr., Lafayette, for Jason E. Harkins.
Franklin White Dawkins, Lafayette, for Father Gilbert Gauthe, et al.
Bob F. Wright, Lafayette, Donald Edward McKay, Jr., New Orleans, for the Society of the Roman Catholic Church, etc.
John Hatch Hughes, Lafayette, for Houston General Ins. Co.
C. Michael Pfister, Jr., Metairie, for Roman Catholic Church of the Diocese of Lafayette.
Before YELVERTON, WOODARD and AMY, JJ.
AMY, Judge.
The plaintiff, Jason E. Harkins, filed this lawsuit alleging that, as a child, he was sexually molested by a priest. Named as defendants *1309 in the action were Father Gilbert Gauthe, The Society of the Roman Catholic Church of the Diocese of Lafayette, Inc., The Roman Catholic Church, Preferred Risk Mutual Insurance Co., Pacific Employers Insurance Company, and Houston General Insurance Company. All the defendants, except Gauthe, filed a Motion for Summary Judgment. Following a hearing on the motion, at which time the vicarious liability theory was dismissed, the trial court granted the Motion for Summary Judgment on the remaining negligence claim. The plaintiff now appeals. For the following reasons, we reverse the summary judgment and remand for further proceedings.

DISCUSSION OF THE RECORD
The plaintiff in this matter, Jason E. Harkins, alleges that, as a child, he was sexually molested by Father Gilbert Gauthe, a priest of the Roman Catholic Church. He maintains that the single incidence of contact took place in 1978[1] at a motor-cross event held in Eunice, Louisiana, when he was eight years of age. Harkins alleges that he attended the event as the guest of friends and, during the course of the weekend, met Gauthe who was also attending the motor-cross races. He states that, although not a member of Gauthe's parish, he was a Catholic school boy at the time, had recently taken his first Catholic communion, and was a member of the Diocese of Lafayette. Harkins also maintains that he was introduced to Gauthe and was aware of his status as a priest.
Harkins alleges that the sexual contact took place when the family, with whom he had traveled to the event, left him alone with Gauthe when they went to register for the event. He asserts that, at that time, he and Gauthe went for a walk on a nearby trail. While on this walk, Harkins alleges, he and Gauthe sat down on a bridge and began talking, in particular about his parents' divorce. Harkins maintains that while sitting on this bridge, Gauthe began touching him, both on the chest and the groin, and, ultimately, sexually molested him. Harkins states that, following this contact, Gauthe told him that God would punish him if he ever told anyone of the incident. Because of this instruction, which he states he believed at the time, Harkins argues that he suppressed the memories of the event.[2] Gauthe denies the plaintiff's allegations.
The record indicates that, following the alleged retrieval of these memories in 1992, the plaintiff filed a petition against Father Gilbert Gauthe and both The Society of the Roman Catholic Church of the Diocese of Lafayette, Inc. and The Roman Catholic Church. Additionally, Preferred Risk Mutual Insurance Co., Pacific Employers Insurance Co.,[3] and Houston General Insurance Co. (hereinafter referred to collectively as "Insurers"), were joined as the above-named defendants' insurers. In that petition, Harkins alleged that the Church knew or should have known of Gauthe's tendencies, but failed to take appropriate measures. Further, he *1310 argued that the Church was vicariously liable to him under the doctrine of respondeat superior[4] as well as by their own negligent retention/supervision.
Both the Church and Insurers filed a Motion for Summary Judgment alleging no genuine issue of material fact. Following a hearing on April 7, 1997, the trial court entered the summary judgment in favor of the defendants. The plaintiff now appeals asserting the following assignment of error:
The trial judge erred in concluding that, as a matter of law, the Church and its supervisory employees owed no duty to plaintiff with respect to acts committed by Gauthe, which were outside of the course and scope of his employment.

LAW
The plaintiff argues that the Diocese and the Church had knowledge of Gilbert Gauthe's pedophilic tendencies and, because of the unique position of a priest in the community, had a duty to prevent Gauthe from perpetrating sexual crimes against children. In particular, the plaintiff maintains that this duty certainly extended to him as he was a Catholic child and, therefore, trusting of the priest in question and, ultimately, more susceptible to the type of injury alleged in the present matter. He argues that genuine issues of material fact exist as to the extent of the influence of Gauthe's position in the alleged incident, the nature of priestly counseling performed by Gauthe on the day of the incident, the extent of the knowledge of the Church's officials, and the reasonableness of the Church's response to any such knowledge.
La.Code Civ.P. art. 966 contains the provisions for summary judgment. The newly amended version of this article provides, in part, as follows:
A. (1) The plaintiff or defendant in the principal or any incidental action, with or without supporting affidavits, may move for a summary judgment in his favor for all or part of the relief for which he has prayed. The plaintiff's motion may be made at any time after the answer has been filed. The defendant's motion may be made at any time.
(2) The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969. The procedure is favored and shall be construed to accomplish these ends.
B. The motion for summary judgment and supporting affidavits shall be served at least ten days before the time specified for the hearing. The adverse party may serve opposing affidavits prior to the date of the hearing. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.
C. (1) After adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted.
(2) The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
This recent amendment to the summary judgment provision has changed the traditional rule that summary judgments are not favored and that documents submitted by the *1311 movant were to be strictly scrutinized while the indulgent treatment was given to those submitted by the party in opposition. Hayes v. Autin, 96-287 (La.App. 3 Cir. 12/26/96); 685 So.2d 691, writ denied, 97-0281 (La.3/14/97); 690 So.2d 41. The provision no longer favors a trial on the merits and now requires that the supporting documents submitted by each of the parties receive equal scrutiny. Id.
With regard to "material fact" as used in the above provision, the supreme court has explained this key term as follows:
A fact is "material" when its existence or nonexistence may be essential to plaintiff's cause of action under the applicable theory of recovery. Penalber v. Blount, 550 So.2d 577, 583 (La.1989). "[F]acts are material if they potentially insure or preclude recovery, affect a litigant's ultimate success, or determine the outcome of the legal dispute." South Louisiana Bank v. Williams, 591 So.2d 375, 377 (La.App. 3d Cir.1991), writs denied, 596 So.2d 211 (La. 1992). Simply put, a "material" fact is one that would matter on the trial on the merits. Any doubt as to a dispute regarding a material issue of fact must be resolved against granting the motion and in favor of a trial on the merits. Sassone v. Elder, 626 So.2d 345, 352 (La.1993); Industrial Sand and Abrasives, Inc. v. Louisville and Nashville Railroad Co., 427 So.2d 1152, 1153-54 (La.1983) (collecting cases); McCoy v. Physicians & Surgeons Hospital, Inc., 452 So.2d 308, 310 (La.App. 2d Cir.), writ denied, 457 So.2d 1194 (La.1984) (noting that "[s]ummary judgment may not be used as a substitute for trial").
Smith v. Our Lady of the Lake Hosp., 93-2512, p. 27 (La.7/5/94); 639 So.2d 730, 751.
As for the standard of review applied to this matter and whether issues of material facts exist, "[a]ppellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate." Reynolds v. Select Properties, Ltd., 93-1480 (La.4/11/94); 634 So.2d 1180, 1183.
In order to succeed under a negligence theory of recovery, a plaintiff is required to prove the following by a preponderance of the evidence: (1) the existence of a duty; (2) the breach of that duty; (3) the defendant's conduct was a cause-in-fact of the plaintiff's injuries; (4) the conduct was a legal cause of the injuries; and (5) actual damages which resulted from the conduct. Roberts v. Benoit, 605 So.2d 1032 (La.1991)(on rehearing).
In the present case, the trial judge found that the facts presented did not indicate that the defendants owed a duty to the plaintiff. After listening to the arguments of the parties' counsel, the trial judge explained his ruling as follows:
I think in this case that Mr. Lambert[5] suggests when is a priest not a priest. Obviously, a priest is in a unique situation in our society as minsters [sic] are, but no more unique than a police officer is in our society. And I beg to differ with you, they're a little bit different than the Orkin man[6]than maybe a public official is. And the issue in this case, as it is in many cases which are on the books, is you still have to show a duty to a particular plaintiff, that duty must still exist when applying a theory of liability, whether it be negligent retention, whether it be failure to supervise. Even if those theories exist, you still must owe a duty to a particular individual.
And, Mr. Lambert, I have to differ with you. I think a priest is not a priest 24 hours a day. I think a priest is a priest 24 *1312 hours a day, just as a law enforcement individual is a law enforcement person 24 hours a day, as a lawyer is a lawyer 24 hours a day, as a judge is a judge 24 hours a day. But the difference is thethose individual's employers are only responsible for him during certain portions of a day. And I think in this situation I have a problem in extending a duty to an individual at a motor-cross event while Father Gauthe is not acting as a priest, is not on [sic] his course and scope of his employment, which we all have agreed to, where he has not held himself out by way of either wearing his uniform or by coming forth and saying, "I will counsel all wayward boys at this motor-cross event," or something to that tune.
And I think the case is totally distinguishable from the Orkin case, in that Orkin went to a particular customer/client's home, went in uniform to that client's home, as I remember the facts, and I may be wrong on this, but I think, came back in uniform when he committed that crime. Even if that's not the factual scenario, it shouldn't matter because he went the first time in uniform.
I don't believe in this situation that the events which transpired are ones that the duty risk analysis set forth by our courts extends this far. And so with regards to that, I'm going to grant the motion by the defendants for summary judgment in this matter.
We initially note that the trial judge couched his findings in terms of a lack of duty and, further, correctly stated that a duty must be owed to the "particular plaintiff." Louisiana courts have recognized that "an actor has no duty to control the conduct of a third person so as to prevent him from causing physical harm to another unless a special relationship exists between the actor and the other so as to afford the other a right to protection."[7]Miller v. Everett, 576 So.2d 1162, 1164 (La. App. 3 Cir.1991)[8]quoting L.P. v. Oubre, 547 So.2d 1320, 1324 (La.App. 5 Cir.), writ denied, 550 So.2d 634 (La.1989). See also Lambert v. Word of Faith Ministries, 95-1436 (La.App. 3 Cir. 4/17/96); 673 So.2d 1150, writ denied, 96-1001 (La.5/31/96); 673 So.2d 1037.[9] However, while the trial judge found that the evidence presented precludes a finding of duty to this particular plaintiff, we conclude that the factual basis offered by the parties raises genuine issues concerning whether such a relationship existed, whether the Church owed an attendant duty, and whether the remaining factors necessary for a recovery in negligence can be proven. It is for this reason that we reverse the trial court's determination.
"The question of whether a duty exists in a particular set of circumstances is a question of law for the court to decide."
*1313 Mathieu v. Imperial Toy Corp., 94-0952, p. 5 (La.11/30/94); 646 So.2d 318, 322. See Mundy v. Dep't. of Health & Human Res., 620 So.2d 811 (La.1993). However, the existence of a duty cannot be determined in the absence of a case's factual background and knowledge of what the surrounding circumstances may be. We are mindful that the elements of a negligence or duty-risk analysis are necessarily flexible and are not always clearly legal or factual because of these considerations. Professors Maraist and Galligan have explained this fluid nature of the analysis as follows:
Duty generally is considered a question of law for the judge, but legal causation is a mixed question of law and fact that the jury decides if reasonable minds could differ. Thus the place in the negligence formula at which the specific risk inquiry is made may control whether the decision is always made by the judge or is sometimes by a jury. It is not surprising to find a lack of uniformity among jurisdictions, or, indeed, within jurisdictions, as to whether the specific risk inquiry is one of duty (for the court) or one of breach or legal cause (for the jury).
FRANK L. MARAIST & THOMAS C. GALLIGAN, LOUISIANA TORT LAW § 5-2, at 102 (1996). In the present case, we conclude that the circumstances surrounding the alleged negligent conduct are not, at this time, such that they render summary judgment proper.
The plaintiffs do not contend that Gauthe was attending the motor-cross event in his capacity as a priest representing the church but that, although he was attending the races on his personal time, his priestly status was a factor in the alleged incident. The defendants submitted an affidavit by Monsignor H.A. Larroque, a former Vicar General of the Lafayette Diocese of the Roman Catholic Church, who testified that he was familiar with "canon law as it pertains to the priesthood." He stated that priests are not on duty twenty-four hours a day nor are they on duty seven days a week. Rather, priests have personal days off in which they are not required to report to the Diocese, perform priestly functions, nor wear clerical dress. Larroque affied that "[i]f a priest counsels a person with respect to God in accordance with Church doctrine on his day off and while on his own initiative, he does so as an individual priest, and not on behalf of the Diocese."
Additionally, Gauthe indicated in his deposition testimony that, as a priest, he received one day per week and vacation time for his personal hobbies. Although Gauthe denies the allegations made against him in the present matter, he acknowledged that he attended motor-cross events. Gauthe stated that the events were "strictly for [his] own recreation and competition." He further indicated that he wore civilian clothing rather than priestly attire to the races and that the only time he could recall wearing a clerical collar to an event was for a memorial service held after two participants had been killed. As for priestly functions at the motor-cross events, Gauthe stated that he had said Mass at one race when asked to do so, but that he had never heard confession while at the event. As for any counseling performed at the races, Gauthe explained as follows when questioned at his deposition:
Q ... Did you ever counsel people in a priestly fashion at the races or race sites?
A Gee, that's hard to answer. You know, if someone was having a problem and they wanted to talk about it, I would sit and talk. But it was not the reason that I went or looking for that opportunity.
Q Okay. That's an interesting point. As a priest, while you had days off and vacation days and things like that, were you ever not a priest
A I don't know what that means.
Q at those motocross races? I understand that you can be off duty. But were you ever not a priest any more?
A I hear what you're saying.
No sir. You know, I don't want to downplay my responsibility in all this. But with the exception of this pedophile problem that I have, I did pretty good work. And I really did try to project an image that would be in keeping with the position.
Q So if someone had sought your counseling at a motocross event, you would have been open to that?
A Probably so. But I have done the same thing in jail, too. I mean, you know, people know who you are.
(Emphasis added). This priestly status, which is conferred by the church, and its *1314 influence in this particular matter along with other factual issues, could possibly support various elements necessary to succeed in the present case, in particular legal cause. We are not here confronted with a situation where a priest's status and the public's knowledge thereof are not important to the alleged damage. See Weatherford v. Commercial Union Ins. Co., 93-0841 (La.App. 1 Cir. 5/20/94); 637 So.2d 1208, writ granted, 94-1793 (La.11/4/94); 644 So.2d 1062, affirmed on other grounds, 94-1793, 94-1793 (La.2/20/95); 650 So.2d 763.[10] Rather, we are confronted by a situation wherein that status is alleged to be critical to the alleged wrongdoing and the issue of liability.
Although Harkins testified that he was a Catholic school boy and that he had just received his first communion, he stated that he had not met Gauthe prior to the weekend of the alleged incident nor had he ever attended a church function involving Gauthe. He stated that his only contact with Gauthe was when they were introduced by the family with whom he spent the weekend at the race. There is no indication in the record that he placed any greater trust in Gauthe because of his status, but, he did state that, because he was a priest, he believed Gauthe's threats that God would punish him if he told of the molestation. The following exchange regarding Harkins' belief in the threat and Gauthe's status is contained in the record:
Q Do you believe that?
A Because they introduced me?
Q What?
A Because I knew he was Father Gauthe because they said, this is Father Gauthe, so I believed him since he was a Father.
It is the reliance or trust placed on this church-given status which is of concern here and which could give rise to the factors integral to the claim of negligent supervision or negligent retention.
The plaintiff maintains, in brief, that at the time he and Gauthe went for a walk and the alleged molestation occurred, Gauthe was counseling him regarding his parents' divorce. While the plaintiff's deposition testimony does not indicate with enough specificity for a final determination whether the conversation rose to the level of priestly counseling, this material fact is put at issue.
Neither do we find conclusive Monsignor Larroque's affidavit wherein he stated that a priest is given time away from the church and that any priestly function he performs on that time off is not on behalf of the church. Rather, it is possible that a church has responsibility because of the status which it has conferred; a status which could affect any type of priestly function performed whether on the church's behalf or the priest's behalf.
Additionally, we find other factual issues that may not be exclusively relevant to the duty element, but which could also be important for determinations regarding breach of duty and legal causation. In particular, we note issues related to whether the defendants had prior knowledge of Gauthe's previous questionable conduct with minors. Although Gauthe testified that he was not removed from his position and stripped of all priestly duties until 1983, Monsignor Larroque's deposition testimony indicates that he had knowledge as early as 1976 or 1977 that "some parents had complained because ... [Gauthe] kissed the children awake in the morning." Larroque stated that he informed Bishop Frey of these reports and that the Bishop recommended treatment for Gauthe. Bishop Frey's deposition confirms that he was told of the kissing incident as well as an incident involving a newspaper boy in Broussard, Louisiana.[11] However, the timing of *1315 this knowledge is unclear from the portions of the depositions before us. We conclude that the quality of the Church's knowledge and the timing of that knowledge are important considerations to be weighed by the trier of fact in deciding the duty as well as the breach of duty elements.[12]
Although summary judgments are now favored, the newly amended La.Code Civ.P. art. 966(C)(2) provides that the burden of proof remains with the movant to "point out to the court that there is an absence of actual support for one or more elements essential to the adverse party's claim, action, or defense." Our review of the record indicates that the defendants have not met this burden. While the evidence may ultimately indicate that the Church owed no duty to the plaintiff and that, even if such a duty existed, there was no breach of that duty or that any breach was neither a cause-in-fact nor legal cause of any damages, we conclude that the record, at this point, does not eliminate the possibility of the Church's liability. Accordingly, summary judgment was improper.

DECREE
For the foregoing reasons, the decision of the lower court is reversed, and the case is remanded to the lower court for further proceedings. All costs of this proceeding are assigned to the defendants, The Roman Catholic Church of the Diocese of Lafayette, Inc., The Society of the Roman Catholic Church, Preferred Risk Mutual Insurance Company, and Houston General Insurance Company.
REVERSED AND REMANDED.
NOTES
[1] We note that, in the petition instituting this matter, the plaintiff alleged that the incident in question occurred in the summer of 1979. However, Harkins changed this date to 1978 in an answer to an interrogatory from Houston General Insurance Company. The plaintiff answered as follows: "Although plaintiff stated in his deposition that he believed the incident happened in the summer of 1979, after speaking with his mother and stepfather regarding their place of residence at the time of the overnight trip with the Gauthier's to the races at Eunice, LA, plaintiff now believes this incident occurred in the summer of 1978."
[2] The plaintiff alleges that he did not tell anyone of the contact with Gauthe and that he suppressed any thoughts of the events. It was only through subsequent counseling that the memories were retrieved. As these events occurred in 1978, the defendants in the matter filed Exceptions of Prescription which were denied by the trial court. This decision was initially reversed in a writ application to this court, however, on rehearing this court set aside its original opinion and affirmed the original holding of the trial court. See Harkins v. Gauthe, W95-769 (La.App. 3 Cir. 3/22/96). The supreme court subsequently denied the writ and held that the defendants "[m]ay reraise on appeal in event of adverse judgment." See Harkins v. Gauthe, 96-0988 (La.6/28/96); 675 So.2d 1122. Although reurged by Defendant Gauthe, the trial court once again denied the exception of prescription on April 14, 1997. Given the lower court's disposition in favor of the defendants, the issue of prescription is not now before this court.
[3] Following the Summary Judgment, Pacific Employers Insurance Co. was dismissed with prejudice on a Joint Motion for Voluntary Dismissal. Accordingly, the company is not a party to the instant matter.
[4] Although the petitioner originally argued that the defendants were vicariously liable pursuant to La.Civ.Code art. 2320, this argument was dropped by stipulation of both parties. Thus, the negligent retention and supervision theories of recovery are the sole theories presently before the court.
[5] The record evidences that James Lambert is counsel for the plaintiff.
[6] Smith v. Orkin Exterminating Co., Inc., 540 So.2d 363 (La.App. 1 Cir. 1989), wherein a customer sued for Orkin's negligent retention/supervision of one of its employees who entered her home on a service call, unlocked a window, and later reentered her home through the window and sexually assaulted her. The first circuit found Orkin liable for their own negligent administration of a yearly polygraph test which was designed to screen employees' behavior. Despite having committed a similar assault in the year prior to the one suffered by the plaintiff, the employee passed the polygraph. The first circuit determined that the employer breached their duty to the plaintiff by failing to ask questions which would have prevented the assault and, thus, the negligent administration of the test was a cause-in-fact of the injuries sustained by the plaintiff.
[7] In considering this "special relationship" and its applicability, or lack thereof, to the instant matter, we are mindful that this is not a "duty to warn" case as are many in this area of jurisprudence.
[8] In Miller, 576 So.2d 1162, the third circuit upheld the trial court's dismissal of the plaintiff's petition on an exception of no cause of action. In this 1991 case, the parents of four minor children sued the pastor of Alpine Assembly of God Church for failure to warn them and legal authorities that the church's youth director had been seeking counseling from him regarding the molestation of children. This court concluded that no special relationship existed between the pastor and the plaintiffs. The court noted that there were no allegations that the molestations were perpetrated by the youth director under the auspices of his church-related job nor was it alleged that the plaintiffs or their children were members of the Alpine Assembly of God Church.
[9] In this third circuit case, the plaintiffs sued individually and on behalf of their two minor children for damages related to the sexual molestation of the children. The plaintiffs named Word of Faith Ministries and its agents as defendants contending that the person who molested the children had, himself, previously been molested by an employee of the church. They alleged that this previous molestation by the Word of Faith Ministries' employee ultimately caused the molestation of the plaintiffs' children. This court affirmed the trial court's determination that no special relationship existed which would have imposed a duty on the defendants. Lambert, 95-1473; 673 So.2d 1150. We note, however, that the relationship, as discussed in Lambert, is different than that under consideration in the present case and that discussed in Miller, 576 So.2d 1162, and in Oubre, 547 So.2d 1320. Rather, in Lambert, a panel of this court discussed the "special relationship" occurring between the "employer" and the "employee" rather than the "employer" and the alleged victim of the abuse.
[10] In this first circuit case, the plaintiff filed suit on behalf of her child who was injured when his bicycle was struck by the vehicle of a priest returning from counseling an ill person. The plaintiff argued that the Church was vicariously liable pursuant to La.Civ.Code art. 2320. However, the first circuit concluded that the priest was not acting in the course and scope of his employment. The court considered that the visit occurred on the priest's day off from work and that he was driving his personal vehicle at the time of the accident. Additionally, the priest testified that he considered counseling people about God on his day off, a personal hobby. The arguments in this case were related exclusively to vicarious liability. There was no allegation that the Church was independently negligent as is the case in the instant matter.
[11] Bishop Frey testified, in a deposition originally taken for an action in the United States District Court, Western District of Louisiana entitled Society of the Roman Catholic Church Diocese of Lafayette v. Arthur J. Gallagher & Co., that he was informed that Gauthe had been involved in an incident with a newspaper boy who delivered newspapers to the rectory. Frey stated that he called Gauthe for a meeting and that Gauthe told him that "the passing contact" with the boy involved "impure acts." Gauthe also told him that "after going to a psychiatrist he saw that he should avoid those things." Bishop Frey stated that he did not know the age of the boy involved.
[12] It is on the basis of knowledge which we distinguish the instant matter from Tichenor v. Roman Catholic Church Of the Archdiocese of New Orleans, 32 F.3d 953 (5th Cir. 1994). In this federal case, the Fifth Circuit concluded that there was no indication that the Church had prior knowledge of a priest's pedophilic tendencies. Mississippi law, on which the case was decided, provides for recovery for employer liability "for an employee's negligence and resulting injuries `if the master should have known' of the employee's misbehavior or incompetence." Id. at 960 quoting Thatcher v. Brennan, 657 F.Supp. 6, 10 (S.D.Miss.1986).